THE STATE ex rel. HADLEY, Attorney-General, v. PEOPLE'S UNITED STATES BANK, Appellant.

(No. 1.)

In Banc, June 20, 1906.

1. **BANK: Receivership: Facts in Case.** It is held in this case, where the published promises of the promoter of a bank, which had thousands of small stockholders scattered over the entire country, that only experienced bankers would be its directors, and that none of its capital would be loaned to him, were adopted and ratified and violated by its board of directors, that the appointment of a receiver under the statutes to wind up the bank's affairs was not authorized thereby, when the bank is solvent.

2. ———: ———: **Regulated by Statute.** Where the proceeding for the appointment of a receiver for a bank is based upon and brought under the statute, the propriety of permitting the appointment will be determined by the statute, and not by the general powers of equity courts to appoint receivers in cases where frauds upon stockholders and depositors are shown to exist.

3. ———: ———: **Purpose of Statute.** The purpose of the statutes concerning the appointment of receivers for banks was not to vex and hinder but to aid the banking business.

4. ———: ———: **Buying Stocks: Offense Atoned for.** Even if the buying by a bank of the stock of other corporations was prohibited by the statutes, and even if that is made a ground for placing its affairs in the hands of a receiver, yet if the bank disposed of the stock and atoned for the offense before the proceeding was heard, the receiver should not be appointed. That would be sour administration of the law, and defeat the very purpose of the statutes.

5. ———: ———: **Carrying Stock in President's Name.** The books of the bank should reveal the names of the actual stockholders, especially where the stock is not fully paid up. But where the bank is in a formative condition, having thousands of subscribers to its stock, some of whom have not paid for their stock, the fact that the stock was carried in the name of the president, who was the bank's promoter, is no ground for appointing a receiver, if at the hearing the order of the Secretary of State that the books of the bank should be made to tell the truth as to the ownership of the stock had been complied with, or was in the orderly process of reasonable compliance.

6. ———: ———: **Fraud Order.** A "fraud order" issued by the Post Office department of the Federal government denying to a bank, located in the outskirts of a big city and doing business largely by mail, the use of the mails, will not be considered as of any force for justifying the appointment of a receiver for the bank upon the prayer of the Attorney-General, for two reasons: first, because the "fraud order" does not rise to the dignity of an adjudication by a court; and, second, because the order alone is pleaded, not the facts and evidence on which the order was based.

7. ———: ———: **Evils Otherwise Correctible.** Where the evils complained of in the management of a bank, shown to be solvent, are correctible in other ways than by the extreme method of appointing a receiver, the receiver should not be appointed.

Appeal from St. Louis County Circuit Court.—*Hon. John W. McElhinney*, Judge.

ORDER APPOINTING RECEIVER REVOKED.

*Carter, Collins & Jones* and *Barclay, Shields & Fauntleroy* for appellant.

(1) A receiver could not properly be appointed to wind up a perfectly solvent bank corporation (as was the defendant) on the facts alleged in the petition, if the general rules of equity jurisprudence are to be followed. No such jurisdiction in equity exists. Equity has power to appoint a receiver as incidental to a suit "to obtain some other relief which the court has power to grant," but not otherwise, unless by statute. Miller Bros. v. Perkins, 154 Mo. 637; Matter of Gen. Electric Co., 143 N. Y. 263; Fischer v. Sup. Court, 110 Cal. 129 (42 Pac. 561); Alderson, Receivers, sec. 347; Smith, Receiverships, sec. 220. (2) At the instance of the State alone (without the action of some one having a pecuniary interest in the corporation) there is no equity jurisdiction whatever (without some statute creating the power) to appoint a receiver to wind up a corporation. Where the State has a pecuniary interest to

protect then it may move. People v. Norton, 1 Paige 17; Havermeyer v. Sup. Court, 84 Cal. 366 (18 Am. St. 192); Attorney-Gen. v. Ins. Co., 2 Johns. Ch. 371. (3) Under the Missouri law the directors are the persons to wind up a corporation if it has need of such services. R. S. 1899, sec. 976. (4) The statutes of Missouri for the regulation of banking corporations permit steps to be taken toward the appointment of a receiver on a showing of insolvency. Here the contrary appears; there is no allegation of insolvency or any jeopardy "to creditors or other indebtedness." R. S. 1899, sec. 1305. (5) No proof on behalf of plaintiff was submitted to the trial court of even such facts as were alleged in the petition, which, however, were denied under oath, and the most specific sworn denials made of every fact (regarding loans, stock investments, etc.) which might possibly be claimed to bear on the condition or action of the bank. When the facts of a bill of complaint are denied under oath, no decree can properly be rendered for complainant without further testimony for complainant, and that is exactly the case at bar. Story, Eq. Pl., sec. 849a; Beal's case, 133 U. S. 290. (6) The petition was not verified, and the "information" upon the "official oath" of the Attorney-General did not amount to sworn evidence of the matter recited in unsworn letters of the Secretary of State. (7) The statement in the statute (sec. 1305, R. S. 1899) of certain facts, on which a receiver may be appointed to wind up a banking corporation, exclude by obvious and clear inference the appointment of such a receiver on any other grounds. (8) . Statutory powers for appointment of receivers to wind up corporations are strictly construed, at best, and not enlarged beyond their terms. Alderson, Receivers, sec. 49. (9) On this appeal, this court has power to, and we ask that it may, dismiss the bill as groundless and without equity. Tornanses v. Melsing, 109 Fed. 710; Smith v. Iron Works, 165 U. S. 524. (10) While the appoint-

ment of a receiver *pendente lite* rests in the sound dis-
cretion of the court, the allowance by law of an appeal
therefrom implies that such orders may be revised and
corrected.   Tornanses v. Melsing, supra; Smith v. Iron
Works, supra. .

*Herbert S. Hadley,* Attorney-General, and *John
Kennish,* Assistant Attorney-General, for respondent.

(1)   The right of the Attorney-General to insti-
tute a proceeding in this case exists by virtue of the
provisions of sections 1305 and 1307, Revised Statutes
1899.   The right of the court to appoint a receiver ex-
ists by virtue of its inherent equity powers extended
and enlarged by the provisions of the statute.   Alder-
son on Receivers, secs. 346, 347.   Under the provisions
of the first half of section 1305, the Attorney-General,
upon information from the Secretary of State that it is
"unsafe or inexpedient" for a bank to continue to
transact business, shall institute such proceedings "as
the nature of the case may require," which proceeding
may be "for any remedy suggested by the conditions
discovered to the court," and the court is authorized to
grant such orders as "the situation of the parties and
the interests involved may seem to require."   These
provisions clearly authorize the court to appoint a re-
ceiver in this case.   Beach on Receivers, secs. 48, 70,
449; Miller Bros. v. Perkins, 154 Mo. 637; Smith on
Receivers, pp. 20, 21; Alderson on Receivers, pp. 483,
484.   (2)   Under the provisions of section 1307, the
right is conferred upon the Attorney-General, when
notified by the Secretary of State that a bank has "vio-
lated its charter or the laws of the State binding upon
it," to institute such action or proceeding as "is au-
thorized in section 1305 against insolvent banks."   Sec-
tion 1305, in so far as it relates to insolvent banks,
gives to the Attorney-General the right to apply to the

197 Sup.—37.

court for a receiver of an insolvent bank, without notice to the bank, and gives to the court the right to summarily appoint a receiver, "any complaints or opposition of the bank or its officers subsequently to be heard in open court." Under the power expressly conferred by the provisions of this section, no question can exist as to the right of the court to appoint a receiver, either with or without notice, of a bank which has violated its charter or the laws of the State binding upon it. Alderson on Receivers, pp. 489-90. (3) The right of the Attorney-General to file an application for a receiver of a bank by virtue of an official communication to him from the Secretary of State, under the provisions of sections 1305 and 1307, Revised Statutes 1899, exists by virtue of the statutory authority conferred upon him by said sections, and not by reason of, or by reason of the absence of any pecuniary interest of the State of Missouri in the affairs of the bank. Gill v. Balis, 72 Mo. 429. (4) Under the provisions of section 976, Revised Statutes 1899, the directors of a corporation are authorized to wind up its affairs only upon dissolution of the corporation. The right conferred upon the directors in this regard is in no sense a restriction upon the right of the court to appoint a receiver for a banking corporation under the provisions of sections 1305 and 1307. The appointment of a receiver of a bank under the provisions of these sections clearly would not work a dissolution of the corporation, nor would such receivership prevent the corporation from resuming business. Thompson v. Greely, 107 Mo. 587; Gluck & Becker on Receivers of Corps., sec. 9, p. 53. (5) The statute does not require that the petition filed by the Attorney-General with the court should be verified. The allegations in the petition of the Attorney-General were made under his official oath, and in such case, in the absence of a statute, no verification is required. This is true even in the case of informations in criminal cases. State v. Kyle, 166 Mo.

306; State v. Brown, 181 Mo. 224; State v. White, 55 Mo. App. 362. And, further, appellant cannot, after joining issue upon said petition in the trial court, ask that a different theory obtain on appeal in this court. (6) The first half of section 1305 is intended to provide for such executive action and such court proceedings as will prevent insolvency. Threatened insolvency clearly exists when a bank has so conducted its affairs as to make it "unsafe or inexpedient" for it "to continue to transact business." This portion of section 1305 clearly conferred upon the court full jurisdiction of the subject-matter and gave to it the power to make such orders as in its discretion "the interests involved seemed to require." To hold that these general powers thus conferred upon the court do not give to it the right to appoint a receiver would be to place an arbitrary restriction upon its discretion and to defeat the clear intention of the Legislature. Under these statutory provisions, the right to appoint a receiver "was a matter of sound discretion on the part of the court before whom the proceeding was instituted, and such discretionary powers should not be interfered with on appeal except in cases where the discretion has been manifestly abused." 5 Thomp. Corp., sec. 6823. Under the provisions of that portion of section 1305 referred to, the court was fully authorized in the appointment of a receiver under the facts stated in the petition of the Attorney-General. Gill v. Balis, 72 Mo. 424; State ex rel. v. Loan Ass'n, 159 Mo. 102; Miller Bros. v. Perkins, 154 Mo. 629; Alderson on Receivers, p. 4; Smith on Receivers, p. 355; 23 Am. and Eng. Ency. Law (2 Ed.), 1007-8; Relfe v. Ins. Co., 5 Mo. App. 173; Beach on Receivers, sec. 48, p. 70; Alderson on Receivers, sec. 497; Gluck & Becker on Receivers of Corps., sec. 9, p. 53; Towle v. B. & L. Ass'n, 67 Fed. 131; Miner v. Bell Isle Ice Co., 93 Mich. 97; Stevens v. Davison, 18 Grat. 819; Blatchford v. Ross, 54 Barb. (N. Y.) 42; Wayne Pike Co. v. Hammons, 129 Ind. 368; Lawrence v. Green-

wich Ins. Co., 1 Paige 587. The second purpose provided for by the latter half of section 1305 was to confer upon the Secretary of State the right to summarily take charge of an insolvent bank and to authorize the court to summarily appoint a receiver for an insolvent bank. The conferring of the right of summarily taking charge of the assets of an insolvent bank either by the Secretary of State or by an order of court was clearly not intended to limit the right of the court to appoint a receiver for a bank under the powers conferred by the first half of this section. (7) Without regard to the right conferred upon the court to appoint a receiver of a bank under the first half of section 1305, the petition of the Attorney-General brings this case clearly within the provisions of section 1307, under which the court had the right to appoint a receiver "as in the case of insolvent banks." Section 1307 provides that in case a bank shall be found to have "violated its charter or any law of the State binding upon it, the Secretary of State shall report the fact to the Attorney-General, who shall institute such proceedings against such corporation as is authorized in section 1305 against insolvent banks." The facts stated in the petition show that the bank had violated its charter and the laws of the State binding upon it in eight different particulars. The facts alleged show that the following statutory provisions "binding upon it" have been violated: Secs. 1275, 1276, 1281, 1290, R. S. 1899.

LAMM, J.—Defendant bank, by virtue of Revised Statutes 1899, section 806, appeals from an order of the circuit court of St. Louis county entered August 15, 1905, refusing to revoke an interlocutory order, granted on a second amended petition, appointing a receiver to take charge of, and to wind up, its affairs.

On motion here the cause was advanced in obedience to the command of said section of the statute and set down for hearing at the January call, 1906, in Banc.

At that time it was argued orally and leave granted plaintiff and defendant to file briefs. During February, 1906, these briefs were supplied and, on March 30th, a *per curiam* order was passed and sent down reversing the order, *nisi,* refusing to revoke the order appointing a receiver, and the trial court was directed to sustain said motion to revoke and proceed with the cause. Opinion to be filed thereafter.

In pursuance of the aforesaid order this opinion is formulated and now handed down.

A resume of the facts in the history of the litigation will show that on July 10th, 1905, the State of Missouri, at the relation of its learned Attorney-General, Herbert S. Hadley, commenced a proceeding in the circuit court of St. Louis county for the purpose of having a receiver appointed for the People's United States Bank, a banking corporation organized under the laws of this State and domiciled in St. Louis county. Upon this petition Judge Selden P. Spencer was appointed receiver on the same day—the scope and character of this order are not in issue and need no notice. An idea of the magnitude of the bank's operations may be got from the fact that four days thereafter he, as such receiver, filed a report of its assets, summarized as follows:

"Exhibit A. Stocks and Bonds (belonging to the Bank) .......... 204,469.92
Exhibit B. Cash in other banks and on hand ........ ...... ........ 346,897.63
Exhibit C. Time and Demand certificates (of deposit in sundry banks) 1,046,758.43
Exhibit D. Time and Demand Loans (due to said bank) ........ ...... 1,010,183.12
Exhibit E. Sundry accounts (carried as assets) ...... ...... ........ 70,935.69
Total ........ ........... 2,679,244.79"

On the 11th of July a writ of summons was sued out and duly served on defendant bank on July 14, 1905, made returnable to the September term, 1905.

Thereafter, limiting its appearance to the purposes of the motion, defendant bank, before the return day, appeared and filed its motion to revoke the order appointing Judge Spencer receiver and, on hearing, said motion was sustained on July 17th and he was ordered to re-deliver to it all its property and assets of every kind in his hands, which order he obeyed.

Following that, on the 19th of July, an amended petition was filed, not only setting forth further facts, but elaborating the allegations of the abandoned petition and enlarging the scope of, and putting in the alternative, the relief prayed. This petition was, in turn, abandoned and needs no attention.

Thereupon plaintiff filed a third pleading on July 29th, 1905, called in the record a second amended and supplemental petition, wherein the relief sought was: (1) the appointment of a receiver to wind up the affairs of the bank; or (2) the appointment of a receiver for the preservation of the assets of said bank, "and for the doing of such other acts as in the opinion of the court may from time to time be necessary;" or (3) if the interests of stockholders and creditors would not be subserved by the appointment of a receiver for either of the purposes aforesaid, then, that the court make an order for the removal of officers and make other orders suggested by the conditions discovered by the court, etc.

The second amended and supplemental petition contained information given to the court upon the official oath of the learned Attorney-General, which information is based upon official communications from the Secretary of State, under his hand and the great seal of the State of Missouri. Defendant, having been notified of the new and pending application for a receiver, appeared conditionally, resisted the appointment and

filed and exhibited to the court certain affidavits deny-
ing some of the averments of the petition, explaining
others and presenting facts deemed pertinent to the
matter then pending, with the result, as said, that on
the 15th day of August, 1905, an order was made ap-
pointing Frederick Essen receiver; and defendant's
motion to revoke this order having been denied, it ex-
cepted, declined to give a supersedeas bond for $100,-
000, perfected its appeal without such bond, and there-
by permitted its assets to pass into Essen's hands and
its affairs to be put in process of liquidation.

Assuming for the purposes of this case that aver-
ments of fact relating to the condition of a state bank,
based on official communication from the Secretary of
State to the Attorney-General, and ascertained by of-
ficial examinations, when presented to a court under
the oath of office of the Attorney-General, are taken as
true, *prima facie,* then a proper consideration of the
questions presented here on this interlocutory order ap-
pointing a receiver seeks an examination of the allega-
tions of the petition and the facts stated in the affida-
vits presented by defendant; for these are the only
proofs adduced. And, broadly speaking, the question
presented below and here is whether, on the allegations
of the petition alone, or on such allegations, taken in
connection with the showing made in defendant's af-
fidavits, the appointment of a receiver can stand.

The second amended and supplemental petition,
covering thirty-four pages of print, is too long to repro-
duce in this opinion. Nor will it be necessary so to do
in order to grasp and formulate the contentions of the
parties litigant. Those contentions, deemed material
on any vital issue, will be taken up one at a time and
in connection with their consideration the pertinent
facts will apear.

I. In the first place, plaintiff, as a chief conten-
tion, insists the facts show that because of promises

made by a promoter before the incorporation of a bank, broken after its incorporation, the bank should be taken as born in the gall of bitterness and in the bond of iniquity, so to speak, as a preconceived and elaborate scheme to defraud—and, hence, the arm of the law should lift its properties and affairs out of the hands of its board of directors and administer them through the court's receiver. The controlling force of this contention is spent upon the insistence that one E. G. Lewis was its originator and promoter and that, as such, he made certain fetching promises in soliciting subscribers to its stock which good faith required should be kept by the bank and which were not kept, except with Punic faith. Not only so, but when the Secretary of State demanded that these promises should be kept, his demands were not only not complied with but counsel were employed to resist them.

To get at the merits of this contention it will be necessary to draw an outline of the situation—thus: Lewis is the president of defendant bank and at the same time the dominating spirit, as chief executive officer, of two other corporations—one, the Lewis Publishing Co., the other, the University Heights Realty & Development Co. Incorporated on November 14th, 1904, with a capital stock of $1,000,000, half paid up, the bank's original articles of association were signed by eighteen persons, seventeen subscribing five shares each, and Lewis subscribing 9915, making ten thousand shares in all. On December 12th, 1904, the Secretary of State satisfied himself by the examination required by Revised Statutes 1899, section 1277, that the requisite capital "had been paid in in cash," and the bank was accordingly permitted to commence business. On March 17th, 1905, its capital stock was increased in due form of law by $1,500,000, fully paid up, and a certificate of such increase issued. So that, as we gather from the record, its capital stock was $2,500,000, of which $2,000,000 were paid, and this capital had been

furnished by, say, 60,000 people living here, there and yonder at the date of the appointment of the receiver. We infer, further, that payments were being made (whether on assessments or not is not shown) and a fund being accumulated to pay up the whole of the original capital. We infer, further, that subscribers sent their money to Lewis who kept the same in special deposits.

With these general preliminary observations, we come to the gist of the matter formulated as a grievance. It seems that prior to the bank's incorporation Lewis was the manager of two monthly or weekly publications issued and owned by said Lewis Publishing Co.—one, the Woman's Magazine, the other, the Woman's Farm Journal, and both were used by him to solicit subscribers (presumably women) to the bank's stock. To attain that end the following inducements, *inter alia*, were held out, and seem to have been effective, to-wit: that the board of directors would be composed of seven strong men who had succeeded in building large fortunes of their own, *i. e.*, men independent in fortune; that the loaning of the bank's funds would be in the hands of fifteen of the most experienced bankers; that the directors of the bank could not and would not loan the funds of the bank to themselves; that such funds were to be deposited in five large banks for the purpose of loaning, and that three directors of each of these banks were to be an advisory board passing upon all loans; that the money subscribed to the capital stock must be either held in cash or invested only in government bonds or such absolutely safe securities that they would pass the inspection of government or state bank examiners; that the bank's affairs were to be so closely watched by the government and state officials that on the slightest sign of mismanagement or impairment of the bank's capital, the examiner would at once step in and protect the stockholders and depositors; that he, Lewis, was arranging his personal affairs so as to take

and pay for $1,000,000 of the stock himself, would be its president, and could not lend himself a single dollar of the bank's funds. Among other things said, Lewis held forth as follows:

"I pledge you all, here and now, that I will give my life and my heart's blood before one tiny speck of that confidence or one penny of that money shall ever be misplaced. . . . It is the king of banks, the dictator of the wealthy man's bank, for it is the people's bank, created by their small sums each, all directors, none of them borrowers, and its debtors will be the great banking institutions of wealthy men. I am straining every nerve to organize for you what I believe to be the greatest bank in the world. I am arranging my resources to put a million dollars into our bank myself, and then trustee my stock so that its earning will go into the reserve of the bank each year, and so that no wealthy scoundrel with the riches of Croesus can ever gain control of our bank, for he must first collect from all over the nation a million dollars of the stock in small sums to offset my single trusteed holdings. He could not do it. In your hands will always be the election of the officers and directors. Only by serving you truly and well can they hold their positions, and I tell you again that I would rather be president of that bank and The Woman's Magazine than President of the United States. Never before have the people of moderate means been permitted to get in on the ground floor of a great bank. This bank of ours, with its capital invested in Government bonds and high-class securities, and which never speculates with its money but deals with other great banks and holds them responsible. . . . I am not only putting nearly a million dollars into it myself but am so doing it as to add to my share of its earning to the reserve of the bank, thereby doubling the values of your stock from year to year. . . . Putting your money into this stock is a very different matter from putting it into some mine or oil

well or industrial enterprise. You take no possible chance of loss under its plan of organization. I would advise my own mother to put the last penny she had in the world into it. . . . . I tell you frankly your profits will burn your hands. . . . I have pledged my fortune and my great publishing company to you in it. .. . . . I will sacrifice the flesh on my body before the purpose of this great bank shall be moved one inch from the path laid out; and I ask you in turn for that confidence and love, as it is the sweetest wine that can ever pass a man's lips. . . . A bank which, never speculating, puts its capital in gilt securities, will forever stand as the tower of safety and strength to a million families whose savings and all it guards. . . . No man, no matter what his wealth, or any combination of men, can ever change the purpose for which this great bank has been organized, or ever divert its funds from the absolutely safe lines that have been laid down, without first obtaining the consent of nearly 70,000 different stockholders. . . . I will put a stumbling-block in the path of the man whose greed for wealth shall ever tempt him to stock-job or bleed it, that will break his neck before he can surmount it. I hope to see the day when an election to the board of this bank will be harder to gain and more sought after than an election to Congress."

It needs not the test of a cold judicial touchstone to determine that a good deal of the foregoing is (using the word in its primal meaning) afflatus—rodomontade. Thus: heart's blood! wealthy scoundrel! Croesus! I would advise my own mother to put the last penny she had in the world into it! profits that will burn one's hands! the promise to sacrifice the flesh of his body! the sweetest wine that can pass a man's lips, to-wit, love and confidence! tower of safety! strength to a million families! stumbling blocks in the path of a man whose greed for wealth shall tempt him to stock-job or bleed the bank, that would break his neck! a hope to see

the day when an election to the board of directors would be harder to gain and more sought after than an election to Congress!—what is all this but a flourish of trumpets of advertising rhetoric of the type used in the exploitation of bitters, Peruna and liver pills—the transparent use of bold hyperbole, of which rhetorical figure it is said that "it lies without deceiving"—all lucubrations of that ilk fail to reach either the form or substance of enforcible promises.

Nevertheless, when the mass is put in a reducing crucible of common sense and the dross of mere verbiage is burnt and refined away, it stands forth, as said, that promises were made by him and that, too, of a substantial sort. For instance, he promised, in effect, the bank should not be a one-man's bank; that it should have a directorate of trained, independent, wealthy financiers who might bring to the loaning of its funds the shrewdness and thrift of experienced wisdom; that the directors should not borrow its funds; that they should be deposited in large banks and were to be kept in cash or invested in government bonds or such absolutely safe securities; and that Lewis could not lend a dollar to himself.

Now, how did the result correspond with the "sounding phrase of the manifesto?" how were these sensible and practical promises kept and performed by the corporation? Indifferently well, it must be admitted. For example, the bank was organized with a directorate composed of Lewis and nominal stockholders, Lewis's underlings at that, i. e., men subordinate to him in his other two ventures, mere vest pocket corporations of his, with not a banker in the lot, and within a few months after its organization nearly a million dollars of its capital are found loaned to the said publishing company and development company—thus doing in a circuit (as the fox runs) exactly what he had promised should not be done in a straight line (as the

bee flies) to-wit, loan the bank's funds to himself or its directors.

When the Secretary of State by official examination ascertained that the directors were not men of experience in finance, fairly to be considered capable of sanely managing so large and important a trust, but, on the other hand, were men not of independent judgment and fortune, but subservient to Lewis in all but name, fetching and carrying for him in other capacities, he complained, and we think rightfully and wisely so. That he was well within his duty and the power created and conferred on him by Revised Statutes 1899, section 1305, must be apparent at a glance. That statute, presently to be set forth, is broad and vests in him large visitorial powers and discretion, among other things, providing that if a bank is conducting its business in an unsafe manner he shall direct the discontinuance of such unsafe practices and strict conformity with safety and security. Accordingly he laid his commands upon the bank that the directorate should be changed, and his demands were so substantially complied with that we do not understand the learned Attorney-General to seriously complain of the personnel of the board of directors at the time of the appointment of the receiver.

But the Secretary of State did not rest here. He deemed said loans as, first, unsafe investments; and, second, as made in violation of the promises of Lewis as a promoter, and so he laid his commands upon the bank that they should be speedily eliminated.

The petition alleges the loans were unsafe, protected by inadequate security, furthermore, that the officers of the bank not only refused to comply with the commands of the Secretary of State and refused to fulfill Lewis' promises as a promoter, but actually increased the loans during the few months the bank was under the fire of official examination, and went further and employed attorneys to resist such commands.

Were the loans unsafe? As we understand the record, they were secured on the properties of the Publishing Co. and the Development Co.· In oral argument in this court it was· asserted by defendant's learned attorneys, and not denied, that all of them had been realized on at the time of the· hearing and the bank had suffered no loss on that score. But, on principle, it must be apparent that the condition of the investments at the time of the appointment of the receiver under the second amended and supplemental petition was the.issue. And conceding, *arguendo,* that the averments of fact in the petition rise to the dignity of proof, and putting those averments in the balances with the averments of fact in the several uncontroverted affidavits filed by the defendant bank for the consideration of the court below, we are of the notion,· without swelling the volume of this opinion with details, that the trial court would not be justified, under the allegations of the petition and the showing made by the affidavits offered by defendants, in finding the loans unsafe investments at that time so as to put the bank in present jeopardy or make them an element of present tangible insolvency, and we so hold.

The remaining question on this branch of the case is whether, conceding the loans safe investments at the time of the application for a receiver, the appointment of one can stand on the theory that the loans were made by the bank after its incorporation in substantial violation of the promises of Lewis as a promoter?

Two views may be taken of these loans. One view is that they follow so quickly on the heels of its organization and in such amounts as show a willful and preconceived plan of violating said promises. In other words, the making of these loans must be held to· tread back and demonstrate that the promises were hollow when made and evidence a fraudulent intent. The other view is that, possibly, the loans were mere temporary

makeshifts rendered convenient during, what may be called, a formative period in the bank's existence — the dates preserved in the record showing that the bank was but getting on its legs as a going concern and had not done business long enough for a settled policy to be deduced from its age and from a long pursuit of a given line of conduct. Assuming, for the purposes of the case, that the violation of the promoter's promises was intentional, which is the worst view to take of the situation (and the one most favorable to the State), what was the remedy—barring an impairment of capital or insolvency?

The general doctrine is that the promoters of a corporation are not its agents in such a sense as to bind it by their acts and engagements when it comes into existence. [7 Thompson on Corporations, secs. 8282, 8283.] Yet such corporation "may become liable to make good those engagements by ratifying or adopting them; and this ratification may take place either by express corporate action, or by any of the other modes by which corporations ratify or adopt the unauthorized or officious acts of others made in their behalf—such as accepting the land or chattel contracted for, or other benefits of the engagement with the knowledge of the fact of its having been made." [Sec. 8283, supra.] In Hill v. Gould, 129 Mo. l. c. 116, it was said by this court, through BURGESS, J.: "The corporation is not bound by the contracts of its promoters, unless so provided by its charter, or by ratification, or express provision after it becomes incorporated, or where it has, knowing its terms and conditions, received benefit from it."

It may not be amiss in this connection to note defendant's contention, which, in the language of Lewis' affidavit, is that the "representations alleged to have been made by him in the communication referred to by the Honorable Attorney-General were statements made by affiant on his own personal account and were

not entitled to and were not in fact made in the name of said bank nor have they been in any way approved by said bank, and said statements were at all times accompanied by a conspicous published announcement that said statements were tentative and mere expressions of the original purposes and intentions which affiant entertained and that they were subject to modification or change in the final organization of the bank and that the charter and by-laws and acts of the corporation after the same was duly incorporated constituted the sole and only representations touching its character and purposes which said bank has made at any time touching its purposes, objects or intentions in the conduct of its business to its stockholders, depositors or the public.''

The charter of this bank is not here and we assume, therefore, that no light is thrown by its provisions in favor of either party on the contention in hand. The most that can be deduced from the record is that the bank, by accepting, presumably with full knowledge, the benefits of the subscriptions obtained by Lewis' promises, ratified the same and thereby became liable to a non-agreeing stock subscriber for non-performance. The learned Attorney-General insists that the State should step in, and, because these promises were not fulfilled, the affairs of the bank should be wound up. But it seems to us that such result is a *non sequitur,* because it can not be denied that a right of action for such broken promises exists on behalf of the subscribers—first, at all events, against the promoter individually, and, second, in certain contingencies, against the corporation itself. Now, the remedy proposed by the State in this instance is to seize and administer upon the assets of the corporation, *i. e.,* in effect, to destroy it—not to cure the corporate sickness—which is somewhat akin to a watchmaker's smashing a watch, out of repair, instead of mending it. The vice of the position, we apprehend, is further illustrated when we con-

sider that no creditor is complaining here, nor are the subscribing stockholders complaining here. For aught that appears in the petition the subscribers may have acquiesced in the change of plans and may have released all right of action, if any they had, for the divergence complained of, or estopped themselves to complain. Not only so, but if the learned Attorney-General's theory be correct, then the State by interposing itself, has suspended, or, to speak more accurately, has interfered with the right of the stockholders to individual relief, if (or when) they chose to assert their rights and remedies in that behalf, and thereby, to a degree, cut away the ground from under the stockholders' feet.

Stress is laid by the learned Attorney-General upon the inherent power of a court of equity to appoint a receiver for a corporation, and that there are no words preclusive of this power in the statutes, and we are cited to general principles laid down by approved text-writers and to an array of authorities sustaining that view in given instances. For instance, it is stated in a general way that "fraud or mismanagement of the affairs of a corporation authorizes a court of equity to appoint a receiver for the property of the corporation." [Gluck & Becker on Receivers of Corps., sec. 9, p. 53.] The right to appoint such receiver is said not to be limited to cases of insolvency. [Smith on Receiverships, sec. 225; Alderson on Receivers, secs. 346-351.] In support of the doctrine of these text-writers we are cited to an array of authorities. For example: Towle v. Building & Loan Ass'n, 60 Fed. 131; Miner v. Belle Isle Ice Co., 93 Mich. 97; Stevens v. Davison, 18 Gratt. 819; Blatchford v. Ross, 54 Barb. 42; Wayne Pike Co. v. Hammons, 129 Ind. 368; Lawrence v. Greenwich Fire Ins. Co., 1 Paige 587; Edison v. Edison United Phonograph Co., 52 N. J. Eq. 620; Rathbone v. Gas Co., 31 W. Va. 798; Duncan v. Treadwell Co., 82 Hun 376;

Schmidt v. Mitchell, 41 S. W. 929; Aiken v. Colo. River Irrig. Co., 72 Fed. 591; Tompkins v. Catawba Mills, 82 Fed. 780; Sternberg v. Wolff, 39 Atl. 397; Cameron v. Groveland Improvement Co., 20 Wash. 169; Jasper Land Co. v. Wallis, 123 Ala. 652; Arents v. Blackwell's Durham Tobacco Co., 101 Fed. 338; Treadwell v. Mfg. Co., 7 Gray 393; Davies v. Monroe Water Works & Light Co., 107 La. Ann. 145; Greeley v. Provident Savings Bank, 103 Mo. 212.

But it will not be necessary to enter the inviting field of judicial exploration pertaining to the inherent power of a court of equity to appoint receivers for mismanaged corporations; and this is so because the petition in this case is evidently drawn under the provisions of sections 1305 and 1307, Revised Statutes 1899, and should be controlled thereby. Those sections are as follows:

"Sec. 1305. Whenever the Secretary of State shall have reason to believe that the capital stock of any corporation or individual banker subject to the provisions of this act is reduced by impairment or otherwise below the amount required by law, or by its certificate or articles of association, he shall require such corporation or individual banker to make good the deficiency. Whenever it shall appear to the Secretary of State from any examination made by him or his examiners that any such bank is conducting its business in an unsafe or unauthorized manner, he shall, by an order under his hand and seal, direct the discontinuance of such illegal and unsafe or unauthorized practices, and strict conformity with the requirements of the law, and with safety and security in its transactions, and if wrong entries or unlawful uses of the funds of the bank have been made, he or they shall require that such entries shall be corrected and such sums unlawfully paid out shall be restored by the person or persons responsible for the wrongful or illegal payment thereof; and whenever any such corporation shall re-

fuse or neglect to make any such report as is herein-before required or to comply with any such orders as aforesaid, or whenever it shall appear to the Secretary of State that it is unsafe or inexpedient for any such corporation to continue to transact business, or that extraordinary withdrawals of money are jeopardizing the interest of remaining depositors, or that any director or officer has abused his trust or been guilty of misconduct or malversation in his official position injurious to the institution, or that it has suffered a serious loss by fire, burglary, repudiation or otherwise, he shall communicate the facts to the Attorney-General, who shall thereupon institute such proceedings as the nature of the case may require.   Such proceedings may be for an order for the removal of one or more of the officers or members of the board of directors, or for any other remedy suggested by the conditions discovered to the court; and the court, or judge thereof in vacation, before whom such proceedings shall be instituted shall have power forthwith to grant such orders, and in its or his discretion, from time to time, to modify or revoke the same and to grant such relief as the evidence, situation of the parties and the interests involved shall seem to require. If from an examination made by the Secretary of State, or by one of his examiners, it shall be discovered that any bank is insolvent, or that its continuance in business will seriously jeopardize the safety of its depositors or other indebtedness, and if the action is taken from an examination by an examiner, such examiner shall recommend the closing of the bank, then it shall be the duty of the Secretary of State, if he approve such recommendation, by himself or one of his examiners, immediately to close said bank and take charge of all the property and effects thereof. Upon taking charge of any bank the Secretary of State shall, as soon as is practicable, ascertain by a thorough examination into its affairs, its actual financial condition, and whenever he shall be-

come satified that such bank cannot resume business or liquidate its indebtedness to the satisfaction of all its creditors, he shall report the fact of its insolvency to the Attorney-General, who shall, immediately upon the receipt of such notice, institute proper proceedings in the proper court for the purpose of having a receiver appointed to take charge of such bank, and to wind up the affairs and business thereof, for the benefit of its depositors, creditors and stockholders; and it is made the duty of the court, or the judge thereof in vacation, summarily to appoint said receiver to take possession of the property and assets of said bank, for the purpose of winding up the business thereof, any complaints or opposition of the bank or its officers subsequently to be heard in open court. The Secretary of State may appoint a special agent to take charge of the affairs of an insolvent bank temporarily, until a receiver is appointed; such agent to qualify, give bond and receive compensation the same as a regularly appointed bank examiner; such compensation to be paid by such bank, or allowed by the court, as costs in case of the appointment of a receiver: *Provided,* that in no case shall any bank continue in charge of such special agent for a longer period than sixty days. Any bank or trust company doing business in this State under the laws cited in this act, may place its affairs and assets under the control of the Secretary of State by posting a notice on its front door as follows: 'This bank is in the hands of the Secretary of State.' The posting of this notice or of a notice by the Secretary of State that he has taken possession of any bank shall be sufficient to place all its assets and property of whatever nature in the possession of the Secretary of State, and shall operate as a bar to any attachment proceedings whatever.'' (Laws 1897, p. 83.)

''Sec. 1307. If any such corporation or individual banker shall refuse to submit its or his books, papers and concerns to the inspection of the Secretary of State

or any of his examiners, or if any officer or director thereof shall refuse to submit to be examined upon oath touching the concerns of such corporation or individual banker, or if it or he shall be found to have violated its or his charter, or any law of the State binding upon them, the Secretary of State shall report the fact to the Attorney-General, who shall institute such action or proceedings against such corporation or individual bankers as is authorized in section 1305 against insolvent banks." (Laws 1897, p. 83.)

Sections 1305 and 1307 are *in pari materia* and, hence, must be construed together. They comprise the body of the statute law relating to the State's control, through the Secretary of State, the Attorney-General and the courts, of banks. They are largely corrective and by way of guidance to reach the goal of good banking and proceed on the theory that an ounce of prevention is worth a pound of cure—that a stitch in time saves nine. Accordingly, they lay upon the Secretary of State the duty of keeping banks within the well-marked channels of good banking; they lay on the Secretary of State the duty of informing the Attorney-General and upon the Attorney-General the duty of applying to the courts for curative or preventive relief, if the admonitions of the Secretary of State prove unsuccessful; they contemplate a receivership for the winding up of the bank's affairs as a last resort—*i. e.,* the only available one in the particular conditions surrounding the bank complained of; and this is so from the very nature of a full receivership.

It is true it has been held that a receivership does not dissolve the corporation — that the corporate entity is left *in esse* (an empty shell) for future use — but such holdings are somewhat by way of metaphor; since, reduced to its ultimate elements, such receivership is the civil death of the corporation, and nothing less; hence, the need of extreme caution. The general doctrine is laid down in Thompson v. Greeley, 107 Mo.

l. c. 587, thus: ''And the appointment of a receiver and a sequestration of the corporate property would suspend the functions of the corporation and virtually operate as an annihilation of corporate rights. These are persuasive reasons why courts should act with great caution, and not take the management of the concerns of corporations out of the hands of directors and managers, to whom the law has intrusted it, except in cases of urgent necessity''—a necessity characterized elsewhere as ''extreme,'' and what is all this but couching in legal phrase the propositions that,

> You take my house when you do take the prop
> That doth sustain my house; you take my life
> When you do take the means whereby I live.

Reading and interpreting sections 1305 and 1307 together, recognizing there is some overlapping in their clauses and some incongruities existing, yet we are not constrained by their language to assume that the Legislature was unmindful of the uniform and well-established doctrine promulgated in Thompson v. Greeley, supra (a doctrine buttressed on reason and common sense) or intended to overturn it, or to lay down any hard and fast rule to be mechanically and harshly applied, whether or no.

It is not necessary for us to decide that there could not be a case where, under said statutes, a bank might not have its affairs wound up through the courts, though not actually insolvent, but which was inevitably approaching the brink of insolvency through vicious methods so deep and all-prevading as to be beyond the help of mere corrective guidance to avoid insolvency; nor is it necessary for us to decide that where a bank had ratified the wise and substantial promises of its promoter and straightway breaks those promises without the acquiescence of the subscribing stockholders—stockholders many, scattered and helpless—the State might not even read the promises into the charter and by-laws and require the bank to comply with them; nor

is it necessary for us to palliate, excuse or justify, by so much as a whit, the non-performance of Lewis' promises in this instance; nor is it necessary for us to weigh or pass on the motives and methods of Lewis as a financier; for if he personally damaged any of his confiding patrons, their remedies are intact and the courts open; nor is it necessary for us to decide that under the sections of the statutes aforesaid there might not be a case where the court should temporarily take the affairs of a bank out of the hands of its directors and officers and place them in the hands of a receiver in order to perserve its assets until such time as the board of directors was reconstructed or the personnel of its officers changed, or the bank made suitable provisions for good banking; or (under the spur of some emergency) until a crisis be passed; nor is it necessary for us to hold that the circuit court of St. Louis county did not have the power under said sections of the statutes to require the investments complained of changed if shown to be unsafe or, from causes then operating, reasonably subject to presently become so and enforce that order by a suitable writ, first giving reasonable time for compliance—all that is necessary for us to hold, and what we do hold, is that, under the facts before us on this record in this case, on the showing made on the motion to revoke the order, a receivership, to lift the assets of the People's United States Bank out of the hands of its board of directors and wind up its affairs, was not a suitable remedy for correcting the evil now under consideration or one contemplated by the statute.

The learned Attorney-General does not press in his brief the averment of his petition to the effect that defendant bank employed counsel to resist the demands of the Secretary of State; for he doubtless considered it could not be expected of this court (leaning, as it does itself, on learned counsel as a staff at every step), that it would make the ungracious holding that the ex-

ecutive officers of the State government have any call to look askance on the employment of counsel, or that they should darken the windows of knowledge and deny themselves the benefit of the wisdom of counsel, let alone should visit punishment on parties employing counsel in departmental matters pending.

II. It was ascertained by the Secretary of State that defendant bank had invested some of its funds in the stock of other corporations, and it was pointed out that this, by necessary implication, was in violation of section 1276, Revised Statutes 1899 — the general rule of law being that "a corporation has no power to subscribe for or purchase shares of stock in another corporation, unless such power is expressly granted, or unless the nature of the corporation and the circumstances under which the stock is acquired are such as to render the transaction a necessary or reasonable means of carrying out the object for which it was created, or of accomplishing some purpose which is authorized by its charter." [1 Clark & Marshall on Private Corporations, sec. 193, p. 523; City of Goodland v. Bank, 74 Mo. App. 365.]

The Secretary of State, on making this discovery, laid his commands upon the bank to dispose of said stock. These commands were obeyed before the receiver was appointed, and that compliance was shown, *nisi*. Conceding that the unexplained ownership of this stock at a prior time was a violation of its charter (a concession made only for the purpose of the case) yet can it be held that under the clause of section 1307, supra, reading, "or if it . . . shall be found to have violated its . . . charter . . . the Secretary of State shall report the fact to the Attorney-General, who shall institute such action or proceedings against such corporation . . . as is authorized in section 1305 against insolvent corporations," the bank should be punished by the appointment of a receiver for this past offense, now atoned for? We think not.

A construction as literal and sour as that, leaving no room for repentance of a sin once committed, a *locus poenitentiae*, would create widespread consternation and ruin, would make banking hazardous beyond common sense. Hence, self-evidently, such view cannot be within the purview of a statute plainly enacted, not to vex and hinder, but to aid the banking business. On this proposition the recognized canon of construction, having its root in high authority, to the effect that the letter killeth but the spirit giveth life (2 Cor. 3: 6 *q. v.*) is applicable. That the law tempers justice with mercy in such matters may be seen by reference to the judgment rendered by this court in State ex inf. v. Lincoln Trust Co., 144 Mo. 1. c. 599.

The same disposition, for the same reason, must be made of the contention that the stock book of defendant bank did not show the names of the actual stockholders, in that the stock was carried in the name of Lewis. And this is so because it appears that subscriptions to this stock were received by Lewis in small amounts—the stock, in some instances, not being fully paid for, and, as said heretofore, the bank was yet in a formative condition. The funds intrusted to Lewis seem to have been preserved intact and the vast number of stockholders added materially to the burden and delay of issuing stock certificates. That the books of a bank should always show the names of its stockholders, and for a major reason where the capital was not fully paid up, as here, is manifest. The Secretary of State, accordingly and properly, demanded the stock book should be made to tell the truth and the whole truth with relation to stock ownership. His demands in this particular had either been complied with or were in the orderly process of reasonable compliance when the receiver was appointed, so that, whatever the remedy, if remedy was called for, a receivership on that account, under the reasoning employed heretofore in this opinion, was out of the question.

III.   It is alleged in the petition in substance that the bank was of novel design, in that it was situated close to St. Louis but in the country, in that it depended on the mail service of the federal government for its business and, in short, was incorporated to do a banking business only by mail—no other plan being practicable, considering its location.   In this fix, it is alleged and stands admitted that one of the executive departments of the federal government, towit, the post office department, on the 6th day of July, 1905, issued what is known as a "fraud order" against Lewis and the bank, denying them the use of the mails, and that said order was in force at the time of the application for a receiver.

It is a little difficult to determine whether the learned Attorney-General contends that the issue of this fraud order, *ex proprio vigore,* is sufficient ground for the appointment of a receiver, or whether he makes the modified contention that the issue of the fraud order is proof that the People's United States Bank was a fraudulent scheme operated through the United States mails and, therefore, as such fraudulent scheme, the bank came within the provisions of the statutes, supra, relating to the appointment of a receiver.   The precise case seems never to have been adjudicated—at least, the industry of counsel has discovered no such case.   Dealing with it on general principles, we think it clear we should not consider the fraud order for various reasons; *e. g.,* it does not rise to the dignity of an adjudication by a court, and, therefore, we are not constrained by the settled and familiar rules of law requiring us to give full faith and credit to adjudications as such.   Not only so, but the order alone is pleaded here, not the facts and evidence upon which the order was based.   The petition alleges an investigation was had by the Postmaster-General, a hearing granted, and the order resulted.   But what facts this investigation uncovered were not disclosed below and

are not shown to us.  Not only so, but if the facts un-
covered by that investigation were disclosed below and
here, they would stand for consideration, it seems to
us, merely as facts on their own merits, disconnected
from the issuance of the fraud order, because it would
be highly improper for us to pass judgment of approval
or disapproval upon an order issued under federal
statutes, or departmental rules, by a department of
the federal government.  For aught we know this order
is temporary in its character.  For aught we know it
may be lifted by federal courts.  It is alleged the order
was sustained on an application to a federal court for
an injunction, but whether the cause is pending on ap-
peal or writ of error is not disclosed.  Be that as it
may, if we concede to the Attorney-General that the
fraud order rendered it impossible for the bank to con-
tinue on its present lines as a going concern, yet, if
(being solvent) it must go into liquidation, or, perad-
venture, change its style of banking, or even move into
a business center in order to continue its banking opera-
tions with a chance of success, why may not these mat-
ters be trusted to its present board of managers and
its stockholders, under the allegations of the petition?
And why must the bank, on that score, be wiped out of
existence through the interference of the State of Mis-
souri, unless, indeed, the sections of the statutes afore-
said are mandatory in giving the Secretary of State
exclusive power to wind up all banks that quit busi-
ness for any cause, whether solvent or insolvent?  We
do not understand the Attorney-General contends that
a solvent bank, having a responsible and suitable board
of directors, whose shareholders and directors may
conclude to go out of business, pay its debts and divide
its remaining assets among its shareholders, may not do
so without the aid of the banking department of the
State government and subject, possibly, alone to the
interference of creditors.  Where public policy is not

concerned, what good reason can be assigned for the intermeddling of the State in private affairs?

IV.   Other questions are presented for our consideration.   For instance, it is alleged that proxies obtained by Lewis from eighty per cent or more of the stockholders are couched in such terms as to be insidiously dangerous to the health of the bank.   It is contended that promotion expenses were charged up to the bank illegally and without being allowed by action of its board of directors; that a note evidencing these promotion expenses, signed by Lewis and certain other individuals, should be paid.   It is, furthermore, contended that Lewis was chosen president and a director of the bank although he was not the *bona fide* owner of at least two shares of the capital stock thereof as provided by section 1281, Revised Statutes 1899.   But all these matters, with others suggested, and not herein determined, do not constitute independent grounds for the appointment of a receiver, under the showing made in this case.   These evils, if found to exist, may be corrected by the court under the flexible power given in section 1305, and under the alternative relief prayed by the second amended and supplemental petition, providing the Attorney-General desires to pursue the matter under the *per curiam* order handed down by this court on March 30th, which reversed the order, *nisi,* refusing to revoke the order appointing a receiver and whereby the trial court was directed to sustain said motion to revoke and proceed with the cause.

*Brace, C. J., Gantt, Burgess,* and *Fox, JJ.,* concur; *Valliant, J.,* concurs in result; *Graves, J.,* not sitting.