LOUISE NIEDRINGHAUS and MERCANTILE TRUST COMPANY, Trustees under Will of OLIVER B. NIEDRINGHAUS, and LOUISE NIEDRINGHAUS, Appellants, v. WILLIAM F. NIEDRINGHAUS INVESTMENT COMPANY, GEORGE HAYWARD NIEDRINGHAUS, Executor of GEORGE W. NIEDRINGHAUS, ALBERT W. NIEDRINGHAUS, LEE I. NIEDRINGHAUS and NATHANIEL B. RANDOLPH.—46 S. W. (2d) 828.

Division Two, December 1, 1931.

*Douglas W. Robert* for appellants.

90

*Gustave A. Stamm, Wm. R. Orthwein* and *Maurice L. Stewart* for respondents.

COOLEY, C.—Suit for appointment of a receiver and for other equitable relief. Louise Niedringhaus individually and as trustee under the will of her deceased husband, Oliver B. Niedringhaus, instituted the action in the Circuit Court of the City of St. Louis on September 29, 1924, against the William F. Niedringhaus Investment Company, a corporation, hereinafter called the Investment Company, and George W. Niedringhaus, Albert W. Niedringhaus, Lee I. Niedringhaus, Frederick C. Orthwein and Nathaniel B. Randolph, said individual defendants being the then directors of the Investment Company. At the return term the then plaintiff filed an amended petition, signed in her capacity as trustee only, naming as an additional defendant the Mississippi Valley Trust Company, which corporation was co-trustee with said Louise Niedringhaus and had refused to join as plaintiff in the suit. Said Trust Company then resigned as trustee and the Mercantile Trust Company was appointed in its stead as co-trustee with said Louise and as such entered its appearance as co-plaintiff, the Mississippi Valley Trust Company being dropped from the case.

The court appointed Charles B. Williams, Esquire, a member of the St. Louis bar, as referee, who heard the evidence and on November 8, 1927, filed his report and recommendations. Shortly before that date and after the evidence had been heard, Frederick C. Orthwein died and the cause was dismissed as to him. Later and while the court had the referee's report under advisement, George W. Niedringhaus died and his executor, George Hayward Niedringhaus, a son, entered appearance as a defendant.

There are two appeals, appearing as separate cases on our docket, which present identical issues and which came about thus: The referee in his report, with which was submitted a transcript of the evi-

dence, stated his findings of facts and conclusions of law, which were in favor of defendants, and recommended judgment accordingly. Numerous exceptions were filed by plaintiffs. The court held the matter under advisement, continuing the case from term to term, until the October term, 1928, when, on November 14, 1928, it overruled the exceptions, confirmed the referee's findings and report, and entered judgment for defendants, dismissing plaintiffs' bill. Motions for new trial and in arrest were timely filed and on November 20, 1928, at the same term, were overruled and upon plaintiffs' application the court thereupon duly granted them an appeal. On the last day of that term, December 1, 1928, the referee filed a motion asking the court to set aside the judgment entered on November 14, and to hear and determine a motion for allowance of fees to the referee and his stenographer which had been filed by the referee with his report and had not been passed upon, and that judgment be re-entered in the cause after such motion for allowance to the referee had been determined. On the same day, December 1, the court sustained the referee's motion to set aside the judgment of November 14, and made an order setting aside the judgment, but did not set aside the order granting the appeal.

On December 3, the first day of the December, 1928, term, the court re-entered the identical judgment which had been entered on November 14. Plaintiffs, after unavailing motions for new trial and in arrest, duly took an appeal from the judgment of December 3. The referee's motion for allowance of fees had not been disposed of when the judgment of December 3 was entered. It was heard and an allowance was made by the court on December 20 and ordered taxed as costs in the case. A separate appeal was taken by plaintiffs from that order, which appeal is also pending here and will be disposed of in a separate opinion. It appears as case No. 29626 on our docket with same caption as the original case.

Plaintiffs' appeal from the judgment of November 14, 1928, appears as case No. 29624 on our docket and that from the judgment entered December 3, 1928, as case No. 29625. Respondents have not moved for dismissal of either appeal, and both sides have abstracted and briefed the case on the merits on both appeals, the abstracts of record and briefs in both being identical. Appellants inform us that they took the second appeal and have briefed the case because uncertain which was legally the final judgment. So far as the merits of the case between plaintiffs and defendants are concerned it is immaterial which judgment is treated as final. The case is here in either event, and those two appeals will be disposed of in one opinion. We state here, however, that for reasons which will be given in our opinion in Louise Niedringhaus et al., appellants, v. William

F. Niedringhaus Inv. Co. et al., Respondents, No. 29626, we have reached the conclusion that the judgment in case No. 29624 is the final judgment in the case and that the circuit court was without jurisdiction to enter the purported judgment appealed from in case No. 29625, an appeal having been taken from the judgment first entered and the order granting appeal not having been set aside.

Appellants filed here a motion to strike from the record respondents' additional abstract. Appellants' abstract omitted considerable evidence not deemed by them material and so condensed other evidence that without the additional abstract we would have had difficulty in understanding clearly some of the facts. Though containing some matter which could well have been omitted, such as colloquy between counsel, etc., we have found the additional abstract helpful. Without further discussion we overrule this motion.

By this action plaintiffs sought the appointment of a receiver for the Investment Company to take charge of and conserve its assets, ascertain all indebtedness due to and from it, to recover debts due and assets claimed to have been wasted, fraudulently conveyed or converted to his own use by George W. Niedringhaus and to make an accounting, and asked also for the removal of George W. Niedringhaus as president and director of the corporation, and for general relief. In thirteen specifications the petition charged mismanagement of the company's affairs and waste of its assets, wrongful and fraudulent acts and conversion of corporation assets by George W. Niedringhaus, domination by him of the other members of the board, concealment from plaintiffs of the true state of the company's affairs and condition, and wrongful failure of the directors to declare dividends. The evidence was voluminous and covered a broad field. We shall give only such outline of the facts as seems essential to an understanding of the case.

The William F. Niedringhaus Investment Company was incorporated March 7, 1911. It was organized pursuant to the will of William F. Niedringhaus who died July 14, 1908. By his will the testator, after making certain specific bequests and provisions to equalize advancements to his children, bequeathed and devised the residue of his property to two of his sons, George and Albert, in trust, with directions that they should form a corporation under the laws of Missouri, with a capital stock of $500,000, and convey to the corporation in payment of the stock the properties so left to them in trust. The will provided that the corporation should have five directors and that testator's sons, George, Albert, Lee and Oliver (husband of plaintiff Louise) and a son-in-law to be selected as provided in the will, should constitute the board of directors. Fred C. Orthwein became the fifth director. The will further provided that George and

Albert, as trustees, should hold the stock except one qualifying share to each director, and receive and distribute the dividends, if any, to testator's widow, children and grandchildren as in the will specified, during the widow's life, and that at her death said trustees should divide the stock into eleven equal parts, giving to each of testator's ten children one part and dividing the remaining one-eleventh part equally between testator's then living grandchildren, and that the trust should thereupon cease.

The corporation was not formed until nearly three years after the death of William F. because the trustees did not feel justified in making the necessary affidavit that the properties to be turned over in payment of the capital stock were worth the amount thereof, to-wit, $500,000. By March, 1911, the affairs of the estate had been so worked out by the trustees that they did feel so justified and they organized the corporation and conveyed to it all property held by them as trustees, the corporation assuming all liabilities of the trustees, which it subsequently paid.

The widow of William F. was dead when the Investment Company was formed, having died some two years after the death of her husband. Immediately after the formation of the corporation George and Albert, as trustees, distributed the stock of the corporation to the children and grandchildren as directed by the will.

Oliver Niedringhaus, son of William F. and husband of plaintiff Louise, acted as a director of the Investment Company until his death in 1916. By his will he left his estate to his widow and the Mississippi Valley Trust Company as trustees.

At the time of the death of William F. Niedringhaus, July 14, 1908, and when his will was written, February 22, 1908, he owned extensive, varied and widely scattered property interests, of large potential value if kept under a single capable management and properly handled so as to pay off the indebtedness and conserve and develop the properties and work out their value; but which, it is evident, could not then have been reduced to money or practicably divided so as to realize any substantial benefit to his widow and children. At a family conference shortly after his death two of the beneficiaries, entitled to one-eleventh each, offered to take $5,000 each for their shares. Most of the properties in which William F. was interested and which were to be turned over to the Investment Company, were owned in common by him and a brother, F. G. Niedringhaus. Their business, as between themselves, had been somewhat loosely conducted for many years, each having confidence in the other. They were heavily indebted and their liabilities as well as their various property interests were intricately interwoven. It is doubtful whether F. G. was financially able to meet his share of the lia-

bilities which, in that event, would fall upon William F.'s estate. George, son of William F., who appears to have been a man of large means, had had to endorse notes in large sums to enable William F. and F. G. to get extensions of time or new loans with which to pay debts they were unable to meet. Financial conditions throughout the country were bad and banks were loath to extend credit. Stocks owned individually by William F. were pledged as collateral to secure debts owed jointly by him and F. G. The income from the properties owned by William F. and F. G. was not sufficient to meet interest on their indebtedness and taxes. Most of the extensive property interests held by them in common were producing little or no income. In a word, the outlook for William F.'s estate was dark.

It was doubtless his realization of the situation and the unpromising condition of his affairs that prompted William F. to provide for the formation of a corporation and to give his beneficiares. stock therein rather than shares in his property itself. Events proved the wisdom of that course. It is not amiss to quote here the findings of the referee, which we think the evidence fully sustains, that at the death of William F. Niedringhaus "the various businesses and enterprises in which he was interested were greatly involved and yielding practically no income. That the estate taken over by the corporation was largely indebted and involved, the assets could not be readily converted into money without sacrifice and the referee finds that by the energetic and judicious management of the business by George W. Niedringhaus and his associates the Investment Company has been brought out of its badly embarrassed condition and put on a paying basis, having a worth at the present time of probably more than two million dollars."

So much is deemed necessary to state by way of giving a general understanding of the situation and the problems confronting George and Albert as trustees and subsequently all the directors of the Investment Company. Further facts will be given as necessary in connection with the consideration of specific charges.

I. The first specification of alleged fraud and waste relates to the probating of two claims against the estate of William F. Niedringhaus, one of $100,000 and one of $90,000. It is charged that George and Albert, while acting as trustees under the will and executors thereof, fraudulently procured one H. E. Hayward to obtain allowance of the claims in the probate court, they knowing that the notes on which the claims were founded had been paid, and that the judgments thus obtained, if permitted to be enforced, would result in waste of the estate to the extent of said $190,000.

Both claims were allowed July 12, 1910, before the incorporation of the Investment Company, the executors waiving service of notice. The $100,000 note had been given by the Granite Realty & Investment Company, a corporation, which we shall call the Realty Company. The stock of that corporation was owned by William F. and F. G. Niedringhaus. The note was dated February 28, 1908, due August 28, 1908, and was endorsed by William F. and F. G. and by Thomas K., a son of F. G. It was secured by the deposit, as collateral, of 1,000 shares of preferred stock of the National Enameling & Stamping Company, a corporation, called hereinafter the Enameling Company, 600 of which shares belonged to William F. and 400 to F. G. On maturity of the note payment was demanded. The Realty Company was insolvent and F. G. and Thomas K. were not able to put up any money nor were the executors without borrowing. The executors loaned to the Realty Company $15,500 and to F. G. $15,500 (the latter sum being subsequently repaid by F. G.), and $70,000 was borrowed from another bank on a note signed by the Realty Company, endorsed by F. G., Thomas K. and George, and further secured by the same 1,000 shares of the Enameling Company stock. The three sums above stated, aggregating $101,000, were used to pay the $100,000 note and interest, and that note was endorsed "without recourse" by the bank and turned over to George. The $70,000 note was renewed from time to time with the same endorsements and collateral until about 1914 when it was paid and the collateral released, F. G. and the Investment Company paying it in the proportions in which they owed it. At the time the $100,000 note was allowed in the probate court, George was still liable on the $70,000 note.

The $90,000 note represented an obligation of William F. and F. G. and was secured by bonds owned jointly by them. It fell due August 1, 1908. Without going into details it will suffice to state that to meet this note George arranged new loans, signing the notes and using the bonds as collateral, with the proceeds of which the $90,000 note was taken up. It too was endorsed "without recourse" and delivered to George. Subsequently the bonds securing the debt were sold, the debt paid out of the proceeds and the remainder of the proceeds properly distributed.

The $100,000 note and the $90,000 note, when taken up as above stated and turned over to George, had not been presented and allowed as demands against William F.'s estate. When the time for presentation of demands was about to expire the executors, George and Albert, were advised by their counsel, a competent and reputable attorney, that for the protection of themselves and the estate they

should have those notes allowed as demands against the estate. George was still liable personally on the $70,000 note mentioned and stocks belonging to the estate were pledged as security for it. Bonds belonging one-half to the estate had been sold without orders from the probate court and the proceeds used in liquidating the $90,000 obligation.

Whether or not it was necessary or proper to have the allowance made, counsel conceived that it would be best to do so and so advised the executors. The advice was given in good faith. Relying and acting thereon the executors procured Hayward, a brother-in-law, to present the demands. The notes were in his possession only long enough to present them to the court and were immediately returned to George. Hayward never claimed any interest in the notes or judgments of allowance and he at once executed and delivered to the executors a written declaration stating that he had no interest in the allowed claims and held them as trustee for the estate. Nothing was ever paid to Hayward or to anyone or retained by the executors on account of the claims. In a settlement filed later by the executors they showed the claims satisfied and the notes, marked ''paid,'' were filed as vouchers, so as to clear the title to some real estate which was being sold.

Regardless of the propriety or impropriety of having the notes allowed as demands against the estate, there is not the slightest evidence of any fraudulent design or improper motive on the part of the executors or either of them nor of any injury resulting to the estate. The referee was well justified in his conclusion that that transaction ''could not be a ground for removal of the directors, or any one of them, or for the drastic remedy of a receiver.''

II. Complaint is made (specification 2) that defendants withheld from plaintiffs and other shareholders information of the transactions, finances and condition of the Investment Company; and (4) that the Investment Company failed to declare dividends which it could have declared out of profits but instead retained the profits in order that George might speculate with such funds for his private gain.

The evidence wholly failed to sustain those charges. The affairs of the Investment Company were discussed frequently and freely among those interested, not only at board meetings, but at informal family gatherings of which there were many. All actions of the board were taken after consideration of the matters acted upon and all had the unanimous approval of the board members. While Oliver Nied-

ringhaus lived he attended the board meetings and family gatherings and approved all that was done. Plaintiff Louise was not an experienced business woman, and moreover, after Oliver's death, was not always present at family gatherings where the company's affairs were discussed. She may not have known or understood as well as the others what was being done, but the evidence does not justify a finding that facts were concealed from her. A complete audit of the company's records and business was made by competent and reputable accountants, extending to December 31, 1922, and a copy furnished Louise and her co-trustee before this suit was filed. It was later extended to cover the period from December 31, 1922, until the hearing. During the audit, which occupied a long time, representatives of plaintiffs were present much of the time and at all times were afforded access to all the records and given all information requested.

The first dividend paid by the Investment Company was one of three per cent on May 10, 1921. Prior to that time, owing to the debts and the involved condition of the company's assets and business as hereinbefore sketched, it was deemed by the directors necessary to keep as much reserve as possible in order to protect the company's interests. Up to December 31, 1922, it had paid in dividends $59,940, and by 1925 a total of about $125,000, of all of which plaintiffs received their proportionate part. The audit showed net profits greatly in excess of that sum, but much of the profit shown, while earned and considered solvent, had not yet been collected in cash. Also part of it consisted of profits made in the sale of the assets of the Granite City Gas Light & Fuel Company (called herein the Gas Company), seven-eighths of the stock of which corporation was owned by the Investment Company, and the proceeds of that sale had not yet been actually turned over to the Investment Company. At the time of the hearing it had not been determined just how the business of the Gas Company would be wound up and what disposition made of that money. The Gas Company transactions will receive further notice under another point. The Investment Company's cash balance at the time of the hearing was small. There was no evidence that dividends were withheld in order to permit George or any one else to speculate with the funds or for any improper purpose.

The directors of a corporation have, in declaring dividends, a large discretion with which the courts will not interfere unless bad faith or abuse of discretion is shown. See Slaydon v. Coal Co., 25 Mo. App. 439, 445; Hayes v. St. Louis Union Trust Co., 317 Mo. 1028, 1044, 298 S. W. 91; Gibbons v. Mahon, 136 U. S. 549, 34 L. Ed. 525; Kranich v. Bach, 204 N. Y. Supp. 320; Clark & Marshall on

Private Corporations, sec. 517f, sec. 529e; Cook on Corporations (7 Ed.), vol. 1, sec. 272, and vol. 2, sec. 545.

The reason for the rule is obvious. It may be and often is for the best interests of a corporation and its stockholders to reserve profits for the purpose of meeting expected requirements or of protecting and developing the company's property and business. The evidence in this case clearly fails to show bad faith or abuse of discretion on the part of the directors in not declaring more or greater dividends.

III. Specification 3 charges that George W. Niedringhaus induced the directors of the Investment Company to invest $25,000 in stock of the St. Louis Coke & Chemical Company (called hereinafter the Coke Company) in order to protect his own investment in stock  of that corporation, which money should have been used in paying dividends. In their brief here appellants say that stock purchase was *ultra vires* and was mismanagement and waste. In this connection it is further insisted that the Investment Company was not a business corporation, but was a trustee under William F. Niedringhaus's will, holding the properties of the estate as such trustee—a contention that runs throughout appellants' brief. We consider the Investment Company a business corporation for reasons to be stated later and will so treat it in considering this assignment.

A statement of some additional facts is necessary to a proper understanding and solution of the question presented by this specification and several others to be considered.

About 1893, William F. and F. G. Niedringhaus acquired several thousand acres of land, then farm land, in Madison County, Illinois, at and about what is now Granite City, upon which they planned to build a city (Granite City) and develop it into a manufacturing and industrial center. They moved to that place from St. Louis a small steel plant which they owned, that being the first industry to be located at Granite City. That plant later merged with or was transferred to the Enameling Company above mentioned, a large concern which established an important manufacturing plant and business at Granite City. Shortly after acquiring the land William F. and F. G. transferred all their holdings in Madison County, Illinois, to trustees, establishing a trust referred to in the record as a common-law trust. We shall call those trustees and their successors the Madison County trustees. William F. and F. G. were and continued to be the beneficial owners in equal shares of substantially all interest in the properties of various kinds then and later held by those

trustees. The operations of the trustees were varied and extensive. The city of Granite City was planned and laid out and a sewer system, pavements, sidewalks and other improvements necessary to a city were installed. Other manufacturing and industrial enterprises were from time to time induced to locate there and gradually a thriving city was built.

The Coke Company was organized in 1919 with a paid up capital of $5,000,000. When it was being promoted in 1918 the Investment Company was asked to subscribe for stock. The Coke Company proposed to build, and did build, at Granite City a large coke plant consisting of eighty ovens, a five-hundred-ton blast furnace for making pig iron, and a chemical reclamation plant, the whole costing $10,000,000 or more. It was expected to and did employ several hundred men. At the time it was being promoted the Investment Company owned 10,870 shares of common stock in the Enameling Company, being the largest single owner, and owned seven-eighths of the stock of the Gas Company. Those stocks composed a very considerable part of the holdings of the Investment Company. It was thought the location of the Coke Company at Granite City would, as it did, enable the Enameling Company to get hot iron for its manufacturing use and would result in an enlargement of its steel plant at Granite City. Getting the hot metal was an important advantage to the Enameling Company as was also the opportunity to get for its use gas which came off the coke ovens, for all of which arrangements were made.

It was also expected that the Gas Company would profit largely from the location of the Coke Company at Granite City. To meet the demands of the city it needed a new gas holder, estimated to cost $65,000 to $125,000, and additional manufacturing apparatus. By procuring gas produced by the coke ovens it could and did avoid the necessity of building a new gas holder and also procured the gas much more cheaply than it could have manufactured it. The Gas Company transactions will have to be discussed further under another head, but it may be remarked here that due to the organization of the Coke Company and its location at Granite City the Gas Company made a very large profit, seven-eighths of which belonged to the Investment Company.

It was also believed that the location of such a large manufacturing industry at Granite City would enhance the value and help the sale of building lots and other property held by the Madison County trustees, a half-interest in which belonged to the Investment Company.

The question of subscribing for stock in the Coke Company was thoroughly discussed and considered by the directors of the Investment Company and it was unanimously decided that the company should subscribe for $25,000 of stock, which was done. Before that conclusion was reached, however, the proposition had been investigated by a committee of business men appointed by the Enameling Company, and a favorable report had been made by that committee. As showing that the Coke Company was considered a good investment it may be said that all of the directors of the Investment Company took stock personally in substantial amounts, George's subscription being $75,000, the Enameling Company took $1,250,000, and the Mississippi Valley Trust Company, co-trustee of plaintiff Louise, which knew of the Investment Company's subscription, itself took a substantial amount, as did its president personally.

After operating for some time the Coke Company had financial difficulties, the nature of which is not explained, and passed through a receivership and a reorganization. It paid no dividends. After the company was reorganized the Investment Company got 329 shares of Class A stock in the new company in lieu of its original stock. The value of the new stock is not shown. Fred C. Orthwein testified that the reorganized company at the time of the hearing was operating successfully and was building a new blast furnace which would cost two million dollars.

The charge that George W. Niedringhaus induced the Investment Company to invest in the Coke Company stock to protect his own investment therein or that such purpose in any way influenced the subscription finds no support in the evidence. There was no fraud or bad faith intended. The evidence leaves no room for doubt that this stock was subscribed for and taken in the reasonable belief that the organization and operation of the Coke Company at Granite City would increase the profits and enhance the value of the Investment Company's holdings and facilitate the sale of building lots held by the Madison County trustees. That it accomplished such results is also clear. To cite a few illustrative facts: The Madison County trustees sold considerable land at good prices to manufacturing industries attracted to Granite City because of the location there of the coke plant; the Enameling Company subsequently built a $2,-500,000 steel mill and was substantially benefited, which of course profited the Investment Company because of its stock holdings; the Gas Company, which previously had not been paying, profited to the extent of over $100,000.

Without entering upon an extended discussion of the question of *ultra vires,* stressed on this and other points in appellants' brief, we

are not convinced that under the circumstances shown in this case the subscription for the Coke Company stock should be denounced as *ultra vires* or unlawful. The Investment Company had taken over and owned, as part of its original assets, stock in the Enameling and Gas Companies, as well as in other corporations. It had those and other property interests at and about Granite City to protect and develop. Its charter powers were broad, including power to "own, acquire, buy, sell, lease and otherwise handle for a profit real and personal property; to invest money in real and personal property for the purpose of making a profit for its stockholders and to invest money in bonds and other negotiable and non-negotiable securities, commercial paper, . . . to invest money in unimproved real estate and to improve the same, . . . to own, hold, rent, manage and dispose of . . . property acquired by this company in the course of its business, . . . to do any and all things which may be necessary in carrying on the above mentioned businesses, . . . the purpose of this company being to invest its capital property and surplus in real and personal property in such manner as shall conserve to (the?) same and yield as large a profit as is possible in carrying on the investment business and to do any and all things incidental to or in connection therewith."

Ownership by a corporation of stock in another corporation is not *per se* necessarily unlawful. In State ex inf. Gentry v. Long-Bell Lumber Co., 321 Mo. 461, 510, 12 S. W. (2d) 64, 86, this court en banc said:

"The above charter language but states the rule in force in Missouri at the time the charter was amended and these subsidiaries were organized. At least since the decision of the case of State ex inf. v. Railroad, 237 Mo. 338, it has been the settled law of this State that a corporation (unless prohibited by express statute) could own stock in another corporation when the purpose of such other corporation was 'to facilitate the business for which' the stockholding corporation was chartered. [State ex inf. v. Railroad, supra, 237 Mo. l. c. 350, 141 S. W. 643.] In that case, a proceeding by *quo warranto,* the railroad company was permitted to own practically all of the stock of two coal mining companies and an elevator company."

The court further said in the same case, same page:

"It thus appears that instead of the stock ownership in these subsidiaries under the circumstances now held in judgment being against the public policy of this State, as contended by informant, the same is clearly within the public policy as declared by the above cases.

"And while it has no bearing on this instant case, it is interesting to note that the Legislature of this State has, since the occurrences now held in judgment, greatly extended the above public policy of the State by expressly providing that manufacturing and business corporations organized under Section 10151 (R. S. 1919) supra, may be given the charter power to purchase and hold shares of capital stock 'created by any other corporation or corporations of this State or other state.' [Laws 1927, p. 394.] And while, as above stated, this recent statute is not controlling here because respondent's charter has not been amended to acquire this extended power as provided by said statute (as might now easily be done), yet it clearly shows the trend of the public policy of this State."

Respondents contend that corporation stock constitutes "securities" within the meaning of that term as used in the charter, citing Fox v. Harris, 141 Md. 495, where that term used in a will was held to include such stock, and Calumet Paper Co. v. Stotts Investment Company, 96 Iowa, 147, 64 N. W. 782, 59 A. S. R. 362, wherein it was held that a corporation with charter powers no broader, we think, than those of the Investment Company, was authorized to deal in, acquire and possess shares of stock in a corporation. In Iowa Lumber Co. v. Foster, 49 Iowa, 25, the corporation had charter power to acquire and hold and to sell or exchange "any real estate *or other property* that may be deemed desirable in the transaction of its business." It was held that under that charter provision a contract to purchase corporation stock owned by the defendant was within the plaintiff corporation's power.

We need not decide whether or not the purchase of Coke Company stock would have been justified as an investment in "securities" or "personal property" within the meaning of the charter had it been made purely as an investment, dissociated from the other considerations above pointed out. Under the circumstances and keeping in mind the reasons for and the purpose of the subscription, we think the case falls within the reasoning of and the principles announced in State ex inf. v. Long-Bell Lumber Co., supra, and that it was not unlawful nor *ultra vires*. See also Drake v. Crane, 127 Mo. 85, 29 S. W. 990, in which it was held that trustees under a will were authorized to donate trust funds in order to secure the erection of a hotel near, but not on, real estate held by them, to the end of conserving and increasing the value and income of property held by them; Putnam v. Juvenile Shoe Corp., 307 Mo. 74, 269 S. W. 593, sustaining the right of directors of a corporation in good faith to pay bonuses to officers when in their judgment warranted by circumstances.

Furthermore, this is an action for the appointment of a receiver. Plaintiffs do not seek an accounting by the directors or by the Investment Company in this action. While their petition might be construed so to ask, their counsel stated at the hearing and in the briefs filed here that they did not ask in the petition and do not ask for an accounting.

It is well settled that courts should proceed with great caution in appointing receivers for corporations and will do so only to prevent irreparable injury or to prevent justice from being defeated, and only when there is no other adequate remedy; that "this great power . . . ought to be exercised . . . ordinarily only in cases of imminent danger of loss, or of damage or of miscarriage of justice." [Price v. Bankers Trust Co. (Mo.), 178 S. W. 745, 749 and cases cited.] See also Thompson v. Greeley, 107 Mo. 577, 587; State ex rel. Hadley v. People's U. S. Bank, 197 Mo. 574, 597, 94 S. W. 953, wherein it is said:

"It is true it has been held that a receivership does not dissolve the corporation—that the corporate entity is left *in esse* (an empty shell) for future use—but such holdings are somewhat by way of metaphor; since, reduced to its ultimate elements, such receivership is the civil death of the corporation, and nothing less; hence, the need of extreme caution."

Clearly the facts proved relative to this specification did not warrant the appointment of a receiver.

IV. In specification 5 it is claimed that George W. Niedringhaus wrongfully induced and caused the directors to deliver to him fifty-four shares of preferred stock of the Enameling Company to which he was not entitled and to pay to him $20,125 as dividends on Enameling Company preferred stock to which money he was not entitled.

William F. Niedringhaus owned at his death 4,384 shares of preferred stock of the Enameling Company which before and after his death paid seven per cent dividends. By his will he first bequeathed to George, as compensation for services rendered to him, 250 shares of that stock and then provided that the balance of that stock should be used in equalizing among his children advancements he had made them. If there should not be enough of that stock to equalize the advancements other stocks were to be used to complete the equalization. There lacked 54 shares of being enough of the Enameling Company preferred stock to equalize the advancements. The estate was in urgent need of money, faced with large direct and contingent

liabilities and had little income and little in the way of assets that were salable without sacrifice. At a family gathering in 1908, after William F.'s death, George told the others that he would let his 250 shares of preferred stock remain with the estate and the dividends be used for the estate during the emergency if it was understood that the stock and the dividends earned thereon would be turned over to him when the estate was financially able to do so. To this all agreed. Upon the organization of the Investment Company that company, in writing, assumed that obligation in taking over the assets of the estate. The executors had used enough Enameling preferred stock to equalize all advancements to the children, leaving only 196 shares. Later, when in financial position to do so, the Investment Company, to carry out the obligation to George which it had assumed, procured additional stock in order to be able to turn over to him 250 shares and did turn over to him that amount of stock and $20,125, the amount of dividends earned by 250 shares to the time of settlement. In procuring the needed 54 shares it bought a block of 100 shares. There was a slight loss ($345) on the remaining 46 shares.

We see nothing illegal or improper in that transaction. No wrong was intended. George was entitled to the 250 shares, before distribution on account of advancements was made, and of course to the dividends thereon. Permitting the estate by agreement to retain and use it until such time as the estate could without sacrifice turn it over benefited rather than injured the estate.

V. We next take specification 13, which has to do with the Gas Company. The Investment Company owned 1750 shares, par value $175,000, of the capital stock of the Gas Company. George owned the remaining 250 shares. It is charged that George fraudulently induced the Investment Company to expend $18,417.16 in constructing a pipe line from the plant of the Enameling Company to that of the Gas Company; that the Investment Company purchased gas from the Enameling Company and sold it to the Gas Company and showed on its books no entry of money received from the Gas Company for such sale, but falsely carried on its books the money so received as a loan from the Gas Company for which it gave the Gas Company its notes, which notes are alleged to be without consideration; that the Investment Company and its directors are using its income for speculative purposes; that the issuance of the notes to the Gas Company created "false liabilities" and that that act and the expenditure of money in constructing the pipe line and for the gas constituted waste and conversion of the assets of the Investment Company.

When the Coke Company was organized it made a contract with the Enameling Company whereby the latter was to and did receive a quantity of gas largely in excess of its own requirements, which excess it was authorized to sell. It offered to George that it would sell the excess gas to any one he might select at a price much less than the Gas Company's manufacturing cost. George, though owning a larger per centage (⅛) of the Gas Company's stock than he did of the Investment Company's stock, wanted the Investment Company to profit by this cheap gas. The whole matter was discussed and considered by the Investment Company's directors and it was determined to take advantage of the proposition. A pipe line was required from the Enameling Company's gas holder to the Gas Company's purifying and distributing plant, which was built by the Investment Company at a cost of $18,417.16. The question of the sale of gas by the Enameling Company direct to the Gas Company was considered. It was thought there would be large profits in the handling of the gas and that if all the profit was made by the Gas Company it might adversely affect the rate the Gas Company was permitted to charge, and also its income tax liability. There was discussion of the formation of a new corporation to own the pipe line and handle the gas sales, and the Investment Company's attorney was directed to work out some plan for handling the business whereby the gas rate might be maintained and Federal income taxes minimized so far as legally possible.

Pending the formation of such plan the Investment Company, on advice of its counsel, paid the Enameling Company for the gas, which was delivered to and purified, sold and distributed to consumers by the Gas Company, and the Investment Company carried these gas transactions on its books in an account called ''Special Loan Account.'' As money became due from the Gas Company for gas for which the Investment Company had paid the Enameling Company, the Gas Company advanced the money to the Investment Company as a loan (instead of paying it for the gas furnished), taking the Investment Company's notes.

The referee correctly sums up these note and bookkeeping transactions thus:

''The transaction was given the appearance of the Gas Company advancing cash to the Investment Company as loans in amounts that the Gas Company would be required to pay to the new corporation, when formed, for the price of the gas (which it had received). Notes were given the Gas Company by the Investment Company representing the price of the gas as it was sold by the Investment Company to the Gas Company. The arrangement was that when the new company was formed the Gas Company would receive payment for these notes from the Investment Company and

would then pay the new company for the gas received. The new company would in turn reimburse the Investment Company for the payments.''

Defendants, while contending that this fiction of the ''special loan account'' was a temporary arrangement pending the working out of a permanent plan for handling the gas business, admit that they were trying to devise a legal way so to handle the gas purchases and sales as to pay as little income tax as possible and to keep the Gas Company from showing too much profit so that the Public Utilities Board of Illinois would not reduce the rate.

Also, as part of the gas transaction, the Investment Company organized the Granite City Gas, Light & Appliance Company, a corporation with a capital of $10,000 furnished and the stock owned by the Investment Company. The Appliance Company was to take over and handle the gas appliance business formerly carried on by the Gas Company.

After the arrangements above outlined were made the Gas Company was highly successful, making large profits. After the institution of this suit (but not because thereof) and before the hearing, it sold its physical assets and business for $530,000, less outstanding bonds of $175,000 and some other debts, the sale netting about $325,000. The same purchaser bought the pipe line and the assets of the Appliance Company. The Investment Company received back all the money it had expended in constructing the pipe line and on account of the Gas Company and Appliance Company transactions, its notes to the Gas Company were canceled and in addition it made a profit from the Gas Company transactions, prior to the sale of that company's assets, of over $100,000; and from the operations and sale of the Appliance Company of over $10,000; and from the sale of the pipe line of about $1,200. Plaintiffs have received their part of the profits made on the gas transactions prior to the sale of the Gas Company's assets and will receive, when distributed, their part of the profits made on the sales of the Gas and Appliance Companies and the pipe line. The gas transactions have been closed and there remained at the time of the hearing only to arrange for the dissolution of the Gas and Appliance Companies and the turning over of the money resulting from the sales of their assets to their respective stockholders.

Neither George nor any of the other directors made or attempted to make any profit for themselves out of the various gas transactions, except of course as stockholders proportionately with other stockholders in the Investment Company. In fact, George would have profited somewhat more, because he owned a larger percentage of stock in the Gas Company than in the Investment Company, had the

Gas Company been permitted to show all the profits earned in the handling of gas. We find no evidence of fraud, mismanagement, waste or conversion in these transactions.

As to the contention (urged here but not in plaintiffs' petition) that the design to avoid a possible reduction of gas rates and to keep down income taxes was a fraud upon the Public Utilities Board of Illinois and the Federal Government, it may be observed that if a plan could have been evolved whereby those results could have been accomplished legally it could hardly be pronounced fraudulent. See United States v. Isham, 84 U. S. 496; Bullen v. Wisconsin, 240 U. S. 625. But whatever may be thought of that matter we do not see that it is material in this case. No danger of injury because thereof is shown to threaten the Investment Company or plaintiffs' interests. Plaintiffs show no ground for the relief prayed with respect to this feature of the case.

VI. Specification 7 is that George fraudulently converted to his own use 4,000 shares of the common stock of the Enameling Company owned by the Investment Company.

As has been shown, the Investment Company was a large stockholder in the Enameling Company. Defendants' evidence shows that in the latter part of 1921, George heard and reported to the other directors of the Investment Company persistent rumors that at the next annual stockholders' meeting of the Enameling Company to be held in February, 1922, an organized effort would be made to change the board of directors of the Enameling Company by removing therefrom members of the Niedringhaus family. It was thought highly desirable for the Investment Company, as well as because of interests of the Niedringhaus family in the Enameling Company, to retain control of, or as strong a representation as possible on, the Enameling Company board. One Langdon and others in New York, friendly to the Niedringhaus interests, were forming a syndicate to buy and sell Enameling Company stock with the view, in part at least, of acquiring enough stock to control the approaching election of directors, and the directors of the Investment Company were asked to put stock owned by that company into the pool being formed by the syndicate. The question was considered and discussed among the Investment Company's directors and it was decided to put into the syndicate pool 4,000 shares of Enameling Company common stock owned by the Investment Company if the syndicate procured a total of at least 30,000 shares, which it did. The 4,000 shares were put into the pool. The stock held by the syndicate was thereafter voted, at least at the 1922 stockholders' meeting, in favor of members of

the Niedringhaus family, who thus retained their positions on the board of the Enameling Company.

Soon after the organization of the syndicate, Langdon, without authority and unknown to his associates, speculated on his personal account with stock which had been pooled with the syndicate, sustaining considerable losses. When that was discovered Langdon was removed and the syndicate, which up to that time was called the Langdon syndicate, was reorganized under the name of Naroma syndicate, the latter taking over the assets and continuing the business.

The syndicate agreement provided that participating members might, in lieu of depositing stock, deposit with the syndicate $12 in cash for each unit of participation. About May, 1924, after controversy with plaintiff Louise had arisen, the Investment Company notified the syndicate that it desired to deposit cash and have the stock returned. Plaintiffs contend that defendants were spurred to that action by Louise's questions and demands. Defendants' evidence tended to show that demand for return of the stock had been made on their own initiative before Louise made any complaint. At all events, about May, 1924, they deposited with the syndicate in lieu of the stock $12 for each share, $48,000, plus interest from the time the stock was deposited, a total of $54,264, and got back the stock.

At the time of the hearing herein the syndicate operations had ceased and the Naroma syndicate was liquidating and winding up the syndicate affairs. The Investment Company had then received as partial distribution on account of the money it had put up in lieu of stock 424 shares of Enameling Company preferred stock and $2,000 in cash. It has hopes of receiving more, but upon that possibility the referee placed no valuation, nor do we. The referee found that the Investment Company will sustain a loss of probably $18,000 to $20,000 through its participation in the syndicate.

Much is said in plaintiffs' briefs and argument about the syndicate having been formed for the purpose of speculation. Whatever may have been in the minds of the organizers we do not think from the evidence that George and the other directors put the Investment Company's property into the pool for such purpose. George and Orthwein, the two directors who testified, said the action was agreed upon by all the directors after full discussion and for the purpose of protecting the Niedringhaus interests by retaining their representation on the Enameling Company board. That such representation was vitally important to the Investment Company is indisputable. The circumstances shown tend to corroborate the testimony of George and Orthwein. The referee was justified in his finding

that the evidence did not indicate fraud or bad faith on the part of George or the other directors in participating in the syndicate.

If the directors used bad judgment that alone would not authorize the relief sought. Even if they might be held liable as for unauthorized use and misapplication of the Investment Company's funds, a question we need not determine, no reason is shown why relief might not be obtained by plaintiffs in some appropriate action without the drastic and extreme remedy of receivership. Courts do not appoint receivers for corporations merely because of past acts or derelictions when no present or future harm threatens because thereof. [Vienna Bakery Co. v. Heissler, 50 Ill. App. 406.] And see Paragraph III hereof.

VII. Specifications 6 and 8 relate to another transaction with the syndicate. After the pooling of the 4,000 shares of stock referred to above the syndicate managers asked for the loan of additional stock and the Investment Company loaned them 5,000 shares of Enameling Company common stock. No reason for making the loan is given except that the syndicate wanted it—presumably to make money with. The loan was amply secured, however, by the deposit for that purpose of $200,000 in a New York bank to the credit of the Investment Company, a sum considerably in excess of the value of the stock loaned. That stock was returned to the Investment Company about April, 1922, and the security was released. No harm resulted, or so far as we can see, could have resulted to the Investment Company because of that loan. What we have said in Paragraph VI disposes of this complaint.

VIII. Plaintiffs in specification 9 charge conversion by the directors, at the instigation of George, of 1600 shares of the Enameling Company common stock owned by the Investment Company. The facts are that by resolution of January 12, 1922, the Investment Company directors caused to be transferred to Frederick C. Orthwein 700 shares and to Nathaniel B. Randolph 900 shares of said stock for the sole purpose of qualifying those men to be elected directors of the Enameling Company. The by-laws of the latter company required a director to be the holder of at least 500 shares. It was desired by and important to the Investment Company to have Orthwein and Randolph on the Enameling Company board, to which position they were elected at the subsequent stockholders' meeting. They never claimed actual ownership of the stock so transferred to them, but promptly endorsed and returned the certificates they had received to the Investment Company. At the time of the transfer to them each exe-

cuted to the Investment Company a written declaration reciting the purpose for which the transfer was made and that he did not claim title to or interest in the stock, but held it for the Investment Company and would return it on request.

We are not concerned in this action with the question of whether or not such "holding" of stock legally qualified Orthwein and Randolph to be elected directors of the Enameling Company. There was no fraud on the Investment Company or its stockholders and certainly no conversion of the stock.

IX. Specifications 10, 11 and 12 involve interwoven facts relating to what is essentially one transaction and will be treated as one. A sketch of the facts will suffice.

Prior to May, 1922, the Madison County trustees held the entire capital stock, 1000 shares, par value $100,000, of the Granite City, St. Louis & Eastern Railroad Company (called the Belt line), the Investment Company being the beneficial owner of one-half thereof and F. G. Niedringhaus the other half. The Madison County trustees owed the Investment Company a note of $30,000, to secure which they had pledged to the latter the 1000 shares of Belt Line stock. The Madison County trustees owed a large sum to F. G. and a larger sum to the Investment Company, both of those two obligations being evidenced only by accounts on the books of the trustees. The Madison County trustees also recognized a liability to George for services rendered to them by him over a period of many years, beginning long before his father's death. They had always intended to pay him and he had expected to be paid. About 1912 the trustees had arranged or concluded to convey to George for said services some lots in Granite City, but for some unexplained reason the conveyance was not made, and later the trustees sold about half of the lots for $17,780, retaining the proceeds, and George relinquished his claim to the lots. The obligation of the trustees to him, however, was recognized both by the trustees and by the William F. and F. G. Niedringhaus families.

It had long been the desire and the effort of the Investment Company to separate its and the F. G. Niedringhaus interests. In the early part of 1922, F. G. was in need of $25,000 and applied to the Madison County trustees for a payment on the account due him from them. They did not have the money. He then, through his son, Thomas K., applied to George. Omitting details the following agreement was made, with the concurrence of all the directors of the Investment Company and the Madison County trustees, and subsequently carried out, to-wit:

George at once advanced, as a loan to F. G., the $25,000 the latter needed. Later, pursuant to the agreement, the Madison County trus-

tees conveyed to the Belt Line a tract of about thirteen acres of land adjacent to its right-of-way, for which they were paid by crediting themselves on the account due the Investment Company on their books the sum of $20,000. The trustees then conveyed to the Investment Company three-fourths of the stock ($75,000 par value) of the Belt Line, for which they were paid $60,000 by the Investment Company by similar credit on their books. The trustees conveyed the remaining one-fourth of the Belt Line stock to George in payment for his services above mentioned.

In order that the trustees might make delivery of the Belt Line stock, which was then held by the Investment Company as collateral for the $30,000 note above mentioned, the latter company released the stock, but retained the note. The evidence shows conclusively that the trust estate is solvent and the note good without the collateral.

It was part of the arrangement that said trustees were to pay F. G. the $25,000 he needed and had borrowed temporarily from George and credit their account due him with that amount. As they had received no cash for the sales of land and stock above mentioned and had not the money on hand the Investment Company loaned it to them. The trustees paid F. G. the $25,000 on their account due him and he paid his debt to George.

Appellants insist so strongly that said $25,000 was in fact paid, fraudulently, to George or for his benefit, that a further word of explanation may be in order. When George made the loan to Thomas K. for F. G. they were in New York City. F. G.'s need was pressing and immediate. George communicated by telephone with his brother Albert in St. Louis who conferred with the others and reported to George. Thereupon George borrowed the money on his personal note from one Moran and loaned it to F. G. as above outlined. When the trustees had procured the money with which to pay F. G. by their loan from the Investment Company, the parties "cut across," so to speak. The trustees issued their draft to Moran who canceled George's note to him and F. G.'s debt to George was thus canceled.

Appellants charge that the consent of the Investment Company to the transfer to George of the 250 shares of Belt Line stock, the release of the collateral for the $30,000 note and the company's consent to the payment of the $25,000 to F. G. (which they say was, in fact, to George) were all induced by the fraudulent machinations of George and amounted to waste of the Investment Company's assets. We find nothing in the evidence that, in our opinion, tends to support these charges or to indicate fraud or undue influence on the part of George or bad faith on the part of any of the directors.

No attempt was made to show that the $30,000 and $25,000 loans to the trustees were not perfectly good without collateral. Defendants' evidence and the audit of the Madison County trustees' books introduced show that they were. The transfer of Belt Line stock to George was in payment of a recognized debt to him and is not shown to have been unreasonable in amount. The payment to F. G. needs no further comment.

X. In their brief here, if we correctly understand them, appellants contend that the Investment Company is not a business corporation, but was organized to take, hold, manage and distribute the property left by William F. Niedringhaus as trustee under his will and that it holds the properties as such trustee and not as absolute owner; that the will contemplated distribution of testator's property—not merely stock in a corporation to be formed—among his beneficiaries; that the debts have all been paid, wherefore the purpose of the corporation has been accomplished and that to construe the will as permitting the corporation to hold the property indefinitely would make it violative of the rule against perpetuities. Appellants say:

"There is no way to prevent this will operating in violation of the rule but by the appointment of a receiver to wind up the affairs, account to the court, recover the value of the converted assets and distribute the assets of the estate of William F. Niedringhaus, which were delivered to the Investment Company as trustee under the will."

Appellants do not challenge the validity of the will but rather defendants' interpretation thereof. In their reply brief they say they never contended that the will of William F. violated the rule or that the Investment Company was not a legally organized corporation or that William F. had not the right or power to direct in his will the organization of a corporation to conserve the assets of his estate and to distribute them.

We are doubtful that this question is within the scope of the issues made by the pleadings and presented in the trial court. Plaintiffs' case below proceeded on the theory that the properties which it was claimed were being wasted or converted were properties and assets of the Investment Company. Plaintiffs sued as stockholders of the corporation asking relief in that capacity. In their petition they do not ask that title to the properties held by the Investment Company be divested out of the corporation, nor for the distribution of the properties, nor for winding up the affairs of the corporation. Plaintiffs appear to have proceeded below upon the theory that the Investment Company is an ordinary business corporation. A litigant

may not change front on appeal. However, we have concluded not thus summarily to dismiss this contention.

It is not clear whether or not appellants concede the validity of William F. Niedringhaus's will if it is properly construed to provide that the property left by him when conveyed to the corporation as therein directed should belong absolutely to the corporation and to give to his beneficiaries stock in the corporation only instead of interests in the property. Appellants, though not challenging, do not expressly concede the power of a testator so to do. Their contention is that the will in this case does not so provide but, as stated above, that it contemplates distribution to the beneficiaries of the property itself. In this we think they are clearly mistaken.

The will in the first paragraph gives testator's widow certain personal property, a life estate in the residence property and provides that she shall have an annual income of $20,000. The second paragraph makes certain specific bequests, not to any of the children or grandchildren. In the third paragraph he names all his children to show that he remembered them and "directs" that "none of my children shall take any thing under the terms of my will *except the shares in the income and interest in the corporation hereinafter mentioned.*" (Italics ours.) By the fourth paragraph he gives George the 250 shares of Enameling Company preferred stock in addition to the share of the estate "hereinafter given" to him, which bequest is to compensate George for services theretofore rendered by George. In the fifth paragraph testator provides for equalizing advancements to the children, as hereinabove mentioned. The sixth, seventh and eighth paragraphs read as follows:

"Sixth: All the rest and residue of my estate, real, personal, and mixed wherever situate, which I may own at the time of death, I give, devise and bequeath to my sons George W., and Albert W., unto the said George W. and Albert W., their heirs, successors and assigns forever, in trust, however, for the following purpose, to-wit:

"Seventh: I will and direct that said trustees shall immediately after my death form a corporation under the laws of the State of Missouri, under the name of The William F. Niedringhaus Trust Company, or such other name as they may see fit to use, with a capital stock of $500,000, full paid, and that the property received by them shall be used to pay up said stock. Said corporation shall have five thousand shares of the par value of one hundred dollars each. Said corporation shall have five directors, and I direct that my sons George W., Albert W., Oliver B., and Lee I., and one of my sons-in-law who shall be selected by placing the names of all of my sons-in-law in a box and then drawing a name from the box and the one so drawn shall be the five directors.

"As soon as said corporation is formed, I direct the said trustees to transfer and convey to said corporation all of the property which I may own whether real, personal or mixed, at the time of my death. This clause shall include all property held by any trustee for me or for my benefit, and if the laws of the State or country in which said land or property may be, does not permit a corporation to hold real estate, then I direct that the said real estate shall continue to be held in the name of trustees, but said trustees shall hold said property for the benefit of said corporation and for no other purpose, and that the income from, and the proceeds of, any sales of property so held shall be immediately paid to and become the property of said corporation.

"Eighth: All of the stock in said corporation except one share which is to be held by each director of said corporation, shall be held by the trustees hereinbefore named, until the death of my beloved wife. Said trustees shall receive all of the dividends paid by said corporation and distribute the same as follows:

"They shall pay to my wife a yearly income of twenty thousand dollars, as hereinbefore mentioned, also taxes and insurance on the property occupied by my wife, after which said income shall be divided equally between all of my children, or in case child or children shall die before my wife, then the share which any child would receive in said income shall be paid to the children of such deceased child or children, so that the children of my deceased child shall receive the share which their deceased parent would have received if living.

"At the death of my wife said trustees shall divide all of the stock in said corporation *and all of the property which they hold in trust under the terms of this will* into eleven (11) equal parts, and give to each one of my children one of said parts, *so that each of my children shall receive an equal one-eleventh (1/11th) part of all of my property*. If any child of mine shall have died at the time such distribution is made, his or her descendants shall receive the portion which would have gone to their deceased parent if living, provided that if prior to the death of my wife any of my children shall have died, leaving no children or descendants, then the portion which would have gone to such child or children, had they not died, shall be distributed equally among the children living and the descendants of such that have died, the children of any deceased child taking together the share which their parent would have received had said parent not died. *The remaining one-eleventh part of my estate* shall be divided equally between my then living grandchildren. *All of the property thus distributed to go to my children and grandchildren and to their heirs and assigns forever*. After the distribu-

tion of said property by said trustees as hereinbefore provided, said trust shall cease." (Italics ours.)

The remaining portions of the will shed no additional light upon the question under consideration.

Appellants insist that the eighth paragraph shows a clear intent that the corporation to be formed was to act as a trustee—was to be merely "a vehicle for conserving the property and for carrying out the provisions of the will as to the distribution to the legatees." They stress as especially evidencing such intent the language of that paragraph which we have italicized.

The above quoted paragraphs deal, of course, only with property not specifically otherwise disposed of. That residuary estate was given to the trustees and by paragraph seven it was to be conveyed to the corporation. There is nothing in the will to indicate an intent that the corporation should take less than the absolute title. It could not own the absolute title and at the same time hold the property as trustee. Nor did the testator attempt further to deal with or dispose of *the property* or direct how the corporation should handle it. He provided in paragraph eight for distribution of the stock of the corporation, which in paragraph three he had expressly stated was *all* that any of his children should take under his will (to be construed necessarily as meaning all except the compensatory bequest to George and the equalization of advancements provided for in paragraphs four and five). In referring in paragraph eight to "property which they hold in trust under the terms of this will," following the direction to divide the stock, the testator may have had in mind the thought suggested in paragraph seven, that there might be real estate the legal title to which the corporation could not hold, or that expression may have been thrown in as a "save-all" clause. It is to be observed too that the language is "property which *they* (the trustees) hold in trust," not property which the corporation so holds. Reading the will in the light of testator's surrounding circumstances (Hall v. Stephens, 65 Mo. 670, 677; Plummer v. Roberts, 315 Mo. 627, 654, 287 S. W. 316) and considering all of its terms we entertain no doubt that its proper construction is that the corporation should take absolute title to the property conveyed to it by the trustees and that testator's children and grandchildren should receive under his will stock in the corporation and not interests in the property itself and that they have no interests in the property except as stockholders of the corporation.

No reason occurs to us why William F. Niedringhaus could not by will make such disposition of his property. A similar disposition by will was held valid in Boyle v. John Boyle & Co. (N. Y.), 136 App. Div. 367, 120 N. Y. Supp. 1048, affirmed 200 N. Y. 597. But

since appellants do not urge that point we shall not add to the length of this opinion by discussing it.

Upon distribution of the stock to the beneficiaries named in the will, which by the terms of the will was to be made upon the death of the widow and was made as soon as the corporation was formed, she being then dead, the stock became the absolute property of such distributees and by the terms of the will the trust thereupon ceased. Manifestly the rule against perpetuities does not apply.

XI. The record in this case is voluminous. The briefs and printed arguments of counsel alone comprise nearly 1,000 pages. We have not overlooked any of appellants' contentions, but obviously it is impossible, without lengthening this already long opinion beyond all reasonable bounds, to mention specifically all of the numerous arguments advanced and authorities cited by counsel. We have endeavored to state the essential facts and to discuss such questions as seemed necessary to a proper disposition of the case.

The charges herein are leveled principally against George W. Niedringhaus who, it is claimed, had for sinister purposes dominated his co-directors and abused his powers to gain selfish personal ends. The evidence does not sustain these charges. We find no evidence that he was actuated by improper motives or that he sought to profit personally at the expense of his associates, or in any way betrayed his trust as officer and director of the corporation. He declined to accept any compensation for his services as executor and trustee under his father's will or as president of the Investment Company. The duties of those positions were arduous and required abilities of a high order and extended over many years. George, it is true, seems to have been the dominating spirit in the management of the Investment Company, this no doubt because he was president and because of his recognized ability and his greater familiarity with his father's affairs and properties. It does not appear, however, that the other directors failed to exercise and act upon their own judgment, which sometimes differed from George's and prevailed. Nor does it appear that any of them ever acted in bad faith. The opinion and sentiment of the stockholders other than Louise is significant. At a stockholders' meeting held in March, 1926, a resolution was adopted ratifying all acts of the directors, including those herein assailed, disapproving this suit and directing the officers of the company to resist the appointment of a receiver. The resolution was adopted by the vote of over ninety per cent of the stock—all of it except that owned by Louise and her daughter.

We agree with the conclusion of the referee that if there have been some mistakes, errors of judgment and irregularities in the conduct of the Investment Company's business they have not proceeded from bad motives, nor have they been so systematically persisted in as to indicate abuse of power, fraud or mismanagement, but, on the contrary, have generally resulted in benefit to the corporation; and that the business since the formation of the corporation has steadily and progressively gained ground until now the company is entirely solvent, a going concern and in a highly flourishing condition. To take the properties and business of this corporation out of the hands of its officers and directors and place them in the hands of a receiver would not only be unjustified on the showing made, but would be highly detrimental to all concerned.

It results that the judgment entered at the October term, 1928, of the circuit court, being case No. 29624 on our docket, should be and it is affirmed. The judgment entered December 3, 1928, being case No. 29625 on our docket, is void, as the circuit court did not then have jurisdiction to render same, and that judgment should be and it is reversed. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.